UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| ROBERT BROWN and THE ESTATE OF BOBBI KRISTINA BROWN | ) |
| Plaintiffs | ) Action No. |
| v. | ) |
| | ) COMPLAINT |
| SHOWTIME NETWORKS, INC., | ) |
| BRITISH BROADCASTING CORPORATION, | ) |
| PASSION PICTURES CORP, TRACEY BAKER- | ) |
| SIMMONS, WANDA SHELLEY,  B2 | ) |
| ENTERTAINMENT LLC and  SIMMONS SHELLEY | ) |
| ENTERTAINMENT, LLC | ) |
| Defendants | ) |

_____)

**JURISDICTION**

1.      Jurisdiction is based on diversity of citizenship and federal question. The amount

in controversy exceeds Two Million Dollars ($2,000,000.00).


2.      This Court has supplemental jurisdiction over Plaintiffs' state law claims arising under the

statutory and common law pursuant to 28 U.S.C. § 1338(b), because those claims are joined with

substantial and related claims under federal law. The Court also has subject matter jurisdiction

over those claims pursuant to 28 U.S.C. § 1367, because Plaintiffs' state law claims are

interrelated with Plaintiffs' federal claims and arise from a common nucleus of operative facts

such that the adjudication of Plaintiffs' state law claims with Plaintiffs' federal claims furthers

the interest of judicial economy.



**PARTIES**

3.      Robert Brown ("Brown" or "RB") is a California resident.

4.     The Estate of Bobbi Kristina Brown ("BKB") is administered by Ann Russell-Herrera, Esq., law office of  Russell & Herrera PC, 201 Swanton Way, Decatur, GA 30030.   This claim has been assigned to Brown.

5.     Showtime Networks, Inc. ("Showtime") is a Delaware entity located at 1633 Broadway, New York, NY 10019 and has a registered agent of Corporation Service Company, 80 State Street, Albany, NY 12207.

6.     British Broadcasting Corporation ("BBC") is an entity in the United Kingdom with a business address at 1120 Ave of the Americas, 5th Floor, New York, NY 10036 and  1995 Broadway, New York, New York 10023.

7.     Passion Pictures Corp. ("Passion"), is a New York entity with an address at 598 Broadway, Std 10D, New York, NY 10012.  The registered agent is Alice Henty, 110 Leroy Street, New York, NY 10014.

8.     Defendant Tracey Baker-Simmons ("Simmons") has an address of 4240 Glen Vista Court, Duluth, GA, 30097. Simmons is an owner of Simmons Shelly Entertainment LLC.

9.     Defendant Wanda Shelley ("Shelley") has an address of 4240 Glen Vista Court, Duluth, GA, 30097. Simmons is an owner of Simmons Shelly Entertainment LLC.

10.     Defendant B2 Entertainment LLC ("B2") is a dissolved Georgia entertainment company[1] with an address of 4240 Glen Vista Court, Duluth, GA, 30097. Simmons was the registered agent and both Simmons and Shelley owned the company.

---

[1] B2 was dissolved before 2009.

11.     Defendant Simmons Shelley Entertainment LLC ("SSE") is an entertainment company that has an address of 4240 Glen Vista Court, Duluth, GA, 30097. SSE is owned by Simmons and Shelley.

## FACTS

12.     Brown is the legendary singer of the group "New Edition" and had a solo career that has led to the sale of millions of albums.  Brown is also the ex-husband of Whitney Houston ("Houston").  Bobbi Kristina Brown ("BKB") is the daughter of Brown and Houston.

13.     In 2017, the Defendants promoted, distributed, the film "Can I Be Me" an alleged documentary of the Houston, the R&B singer who died in 2012.

14.     The film contains footage that Brown and BKB has never consented to have released. Brown and BKB appear in the film for a substantial period of time, in excess of thirty (30) minutes.

15.     The footage was actually recorded prior to the divorce in 2007 between Brown and Houston. Brown never signed or executed a release for the airing of the material that appears in the film. The footage of Brown is approximately fifteen (15) years old.

16.     Upon information and belief, in addition to Brown and BKB, many others in the film never signed releases for their images to be in the film. Generally filmmakers seek to obtain video release forms and to get them signed by individuals who speak on camera if you shoot video of a private, non-public event.  Brown and BKB did not sign video

release forms. Assuming that Plaintiff have proper title to the footage, they do not have proper title to its contents.

17.     Showtime and Passion distributed "Can I Be Me" in August 2017 without the consent of the Plaintiffs or their approval to appear in the film. The film has aired all over the world.

18.      The BBC is airing "Can I Be Me" in the United Kingdom without the consent of the Plaintiff. http://www.bbc.co.uk/mediacentre/proginfo/2017/36/whitney-can-i-be-me . See Exhibit "A". The BBC unlawfully obtained the film from Passion and/or its affiliates.

 19.     Upon review of the credits that aired at the conclusion of the film "Can I Be Me", the defendants allege that Brownhouse Entertainment, Inc. ("Brownhouse"), Brown's company is credited, indicating/suggesting that Brownhouse provided and approved footage for the film.   See Exhibit "B".  Plaintiff did not provide any footage for the film and does not consent to any of its footage being used.

20.     Upon information and belief, Defendants BBC, Showtime and/or and Passion have licensed the film "Can I Be Me" to Arsenal Filmyerleih in Germany, Eagles Pictures in Italy and Periscoop Film in the Netherlands without the consent of the Plaintiffs. All the Defendants are keenly aware that intellectual property about the Plaintiffs and Houston are very valuable and of interest to the public.

21.     The film also contains images of RB, BKB and RB's other children, Landon Brown, Robert "Bobby" Brown Jr. and LaPrincia Brown as minor children.  Brown never

4

consented to have his children appear in the film "Can I Be Me" and his children never consented.

22.     The film also contains segments in which RB and BKB (as a minor child) are singing and performing on stage. The Plaintiffs have never consented to having the material appear in the film "Can I Be Me" and never cleared the music or performances of RB or BKB in the film.

23.     The Defendants' have violated RB rights to publicity and privacy.

24.     BKB died in 2015 in the state of Georgia.

25.     Georgia's courts have developed a common law right of publicity. Various Georgia court decisions refer to the "right of publicity," "misappropriation of likeness," and similar terms. The Supreme Court of Georgia's 1982 decision in Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.

26.     Georgia's right to publicity survives death. See King v. Heritage, 296 S.E.2d 697 (1982).

27.     Georgia's right of publicity protects against unauthorized uses of a person's identity "for financial gain." The King defendant's sale of plastic busts was considered commercial, . In Alonso v. Parfet, the Georgia Supreme Court further ruled that use of a person's name on "various forms and documents" used in the course of business could establish a violation. 325 S.E. 2d 152 (Ga. 1985).

28.     The Estate of BKB did not consent to the release of the film and the Defendants

have violated the right of BKB. The Defendants are using the life, image, name and

likeness of BKB for financial gain in violation of rights of the Estate of BKB.


29.     In June 2016, Nick Broomfield ("Broomfield"), a producer associated with

Passion, requested that Brown provide an interview for an upcoming Houston film.  See

Exhibit "C".  RB declined the request. The Defendants knew of RB's desire not to be a

part of the Defendants' film, however they utilized his name, likeness and persona in the

film without his consent.


30.     Leading to the release of the film, the Defendants utilized the name, persona and likeness

of RB in the marketing, and promotion of the film.  The promotion of the film by the Defendants

included providing screeners before the actual release date  of  the film and providing the press

with the opportunity to review the film before the release date and commit on the manner in

which RB is depicted in the film in advance of the release.  This was part of the marketing

strategy of the defendants. https://www.weekendnotes.com/whitney-can-i-be-me-screening-

exclusively-at-cinema-paradiso/ ; https://www.cbscorporation.com/events/whitney-can-i-be-me-

screening/ ; https://www.screendaily.com/reviews/whitney-can-i-be-me-tribeca-

review/5116838.article Exhibits "D"- "F". Upon information and belief, the defendants gave

screeners of the movie to the press prior to the release of the film, which depicted RB in order to

have the press prepare reviews that included RB as part of the marketing of "Can I Be Me"

publicly.

31.     In 2004, RB through his company Brownhouse Entertainment, Inc.

("Brownhouse") (dissolved), and Shelley/Simmons through their company B2

(dissolved), signed an agreement for the creation of the television series, "Being Bobby

Brown" ("Contract 1"). The show aired on Bravo for one season.


32.     Pursuant to the agreement between B2 and Brownhouse, B2 agreed not to use any

materials associated with Brown's family friends or employers without his consent in tv

or film projects.  Section 2(b) and section 6 on the Agreement reads as follows:

Section 2 (b) on the Contract

> b.     By Brownhouse:
>
> i.     Brownhouse shall lend the services of Artist,
> and Artist shall perform on-camera talent services on
> an exclusive basis during all periods of production and
> Artist shall undertake no services that would materially
> interfere with Artist's services hereunder.  Artist grants
> to Company the right to use, film, tape and otherwise
> record events relating to or occurring in Artist's life
> and portions of Artist's life story including without
> limitation any relationships with family, friends,
> employers and the like during and after all phases
> of production of the Project, so that Company can
> produce episodes of the Project, and so that Company
> can distribute, exhibit and/or otherwise use the Project
> and/or other works, productions and materials based thereon.
>
> 6.     Confidentiality:  Except where required by
> law, **both parties shall keep confidential the Project and any
> ideas, concepts, stories plots, themes or other material related
> to the Project unless express written consent is provided by
> the parties.  Neither party shall: circumvent the other's role
> and anticipated financial compensation in connection with
> the Project or other unscripted television programs; negotiate
> a side deal with any third party in the which does not
> include the other party; or any way attempt to circumvent the
> spirit and intent of this Agreement.**

7

See Exhibit "G".

33.     Passion, BBC and Showtime have utilized footage provided by Simmons, Shelley, B2 and SSE that was  obtained by B2 while working with RB on "Being Bobby Brown" and have utilized the material in the film "Can I Be Me". This includes information about WH, BKB, RB and others. The Defendants have not obtained the written consent of RB for the usage of the "Being Bobby Brown" footage in the film.

34.     SSE, B2, Simmons and Shelley have (1) circumvented RB's role (2) have negotiated a side deal with a third party to make the BKB project with includes information obtained and associated with the show "Being Bobby Brown" and  (3) circumvented the spirit and intent  of the Agreement in violation of paragraph 6 of the Agreement by utilizing information, concepts, ideas , materials  and footage obtained during the production of "Being Bobby Brown" to make the movie "Can I Be Me" without the consent of RB.

35.     Brown and his company performed their obligations under the Agreement. B2, Shelley and Simmons have provided footage of "Being Bobby Brown" to the Defendants in violation of the agreement reached in 2004.  As B2 was dissolved before 2009, SSE , Shelley or Simmons had no rights to the "Being Bobby Brown" footage and had no rights to license or assign the footage to the other Defendants.

36.     All the Defendants were informed in 2017 that the Plaintiffs' rights have been violated, however, the Defendants continued to air the film with the knowledge that the use of the Plaintiff images and likeness were not authorized.

**COUNT I**
**VIOLATION OF ARTICLE 5**
**CALIFORNIA CIVIL CODE SECTION 3344**
**ROBERT BROWN**
**AGAINST ALL DEFENDANTS**

37.     Brown repeats and realleges each of the preceding paragraphs 1-36 and 73-79

below.

38.     The basis for this right of publicity is the idea that every person should have the

right to control how their identity or likeness or personality, or voice, name or image is

commercialized by others.

39.     A defendant violates California Civil Code § 3344  by (1) for advertising or

selling  a defendant  (2) without written consent (3) utilizes, the voice, persona, likeness,

image or portrait or photography of a person (4) in commerce.

40.     The Defendants movie aired in California, New York and across the world

without the consent of Brown and utilized Brown's image and voice without his consent.

41.     Defendants' are utilizing, the life, images and persona of Brown for their personal

gain in violation of the law and Contract 1. Plaintiffs have been harmed by the actions of

Defendants.

## COUNT II
## VIOLATION OF ARTICLE 5
## CALIFORNIA COMMON LAW RIGHT OF PUBLICITY
## ROBERT BROWN
## <u>AGAINST ALL DEFENDANTS</u>

42.      Brown repeats and realleges each of the preceding paragraphs 1-36.

43.      The basis for this right of publicity is the idea that every person should have the right to control how their identity or likeness or personality, or voice, name or image is commercialized by others.

44.      In <u>Eastwood v. Superior Court</u>, 149 Cal. App. 3d 409, 198 Cal. Rptr. 342 (1983), the California court of appeal stated that the common law right of publicity cause of action "may be pleaded by alleging (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." Id. at 417, 198 Cal. Rptr. 342 (citing Prosser, Law of Torts (4th ed. 1971) § 117, pp. 804-807).

45.      The Defendants' movie aired in California, New York and across the world without the consent of Brown and utilized Brown's image and voice without his consent.

46.      Defendants' are utilizing, the life, images and persona of Brown for their personal gain in violation of the law and Contract 1. Plaintiffs have been harmed by the actions of Defendants.

**COUNT III**
**VIOLATION OF GEORGIA**
**RIGHT TO PUBLICITY**
**ESTATE OF BKB**
**AGAINST SHOWTIME NETWORKS, INC.,**
**BRITISH BROADCASTING CORPORATION AND**
**PASSION PICTURES CORP.**

47.     Estate of BKB repeats and realleges each of the preceding paragraphs 1-36 and

72-76 below.


48.      Defendants have violated the Georgia common law right to publicity.


49.     The Defendants have aired the film without the consent of the Estate of BKB.


50.     The Defendants have aired the film without the consent RB which was mandated

by the Contract 1.


51.     Defendants' are utilizing, the likeness, life and persona of BKB for their personal

gain without the consent of the Estate of BKB.


52.     The Estate of BKB has an interest in the name, likeness and persons of BKB

which has been harmed by the actions of the Defendants.



**COUNT IV**
**LANHAM ACT-ROBERT BROWN**
**AGAINST ALL DEFENDANTS**


53.     Plaintiffs repeat and reallege each of the preceding paragraphs 1-46.

54.     Section 43(a) of the Lanham Act creates liability for "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce . . . false or misleading representation of fact, which is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1).

55.     RB is an international superstar. The use of RB's name and likeness has caused confusion as the origin of the movie and suggests that Brown supports, approved and consented to the Defendants film.

56.     The credits in the film suggest that RB's and his company (Brownhouse) consented and authorized the use of his image and voice in the film which is inaccurate and false.

57.     The Defendants are utilizing the likeness of RB in the marketing, promotion and distribution of the film which is causing confusion as to the origin, sponsorship and approval of the film. The promotion include screeners before the actual release date and providing the press with the opportunity to review the film before the release date.

https://www.weekendnotes.com/whitney-can-i-be-me-screening-exclusively-at-cinema-paradiso/
https://www.cbscorporation.com/events/whitney-can-i-be-me-screening/

58.     RB does not endorse the film and did not consent to the use of his image, name and voice in the film. The Defendants have damaged the Plaintiff.

**COUNT V**
**BREACH OF CONTRACT**
**ROBERT BROWN**
**AGAINST B2**

59.     RB repeats and realleges each of the preceding paragraphs 1-41, 53-58 and 72-76.

60.     RB through Brownhouse entered into an agreement with B2 in 2004. All of

Brownhouse interest have been transferred to RB.

61.     Shelly and Simmons were the owners of B2 before it was dissolved.

62.     RB was the owner of Brownhouse before it was dissolved and the company's

rights have been transferred to RB.

63.     The parties contract related to the show "Being Bobby Brown" which starred the

Plaintiff.

64.     RB and Brownhouse performed the contract.

65.     B2 breached the contract, particularly paragraphs 2 and 6 of the agreement and

provided material about RB and others, to the other defendants that are the subject of the

contract between Brownhouse and B2.

66.     The breach has harmed Plaintiff in his business.

**COUNT VI**
**PERMANENT INJUNCTION**
**ROBERT BROWN AND ESTATE OF BKB**
**AGAINST SHOWTIME NETWORKS, INC.,**
**BRITISH BROADCASTING CORPORATION AND**
**PASSION PICTURES CORP.**

67.     Plaintiffs repeat and reallege each of the preceding paragraphs 1-66 above and 72-79 below.

68.     Plaintiffs are entitled to an injunction against the Defendants

69.     *Grounds.*

13

Plaintiffs will suffer immediate and irreparable injury, loss, or damage if Defendants' conduct described above is not enjoined for these reasons: (1) Defendants' are violating Plaintiffs' statutory and common law right to publicity and (2) Defendants have violated the Lanham Act. Plaintiffs do not have an adequate remedy at law because the Defendants continue to use Plaintiffs names, likeness and images. Plaintiffs have exercised due diligence in prosecuting this claim. The injury to Plaintiffs if the Defendants continue the conduct described above would outweigh any injury the restraining order and injunction might cause Defendants. An issuance of the restraining order and injunction would not disserve the public interest.

70.      Plaintiffs have a likelihood of success on the merits.

71.     Plaintiffs seeks a restraining order restraining Defendants' their officers, agents, servants, affiliates, assignees, and employees from directly or indirectly marketing, selling, promoting, distributing the film "Can I Be Me".

### COUNT VII
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### BROWN AGAINST SHOWTIME NETWORKS INC., SSE, SHELLEY, SIMMONS
### BRITISH BROADCASTING CORPORATION AND
### PASSION PICTURES CORP.

72.     Plaintiff realleges paragraphs 1-71 above.

73.     Pursuant to Contract 1, B2 was not to negotiate any side deals or deprive RB of any financial participation.

74.     B2 was not to circumvent the spirit of the Contract 1.

14

75.     B2 never informed that footage of "Being Bobby Brown" was to be utilized in the film "Can I Be Me." The footage contained images of Brown, BKB and his other children.

75.     Brown never consented to the usage of the footage in the film and his consent was required.

76.     B2 is dissolved and upon information and belief, SSE with the assistance of Shelley and Simmons licensed the footage to the other Defendants unlawfully.

77.     SSE, Shelley, BBC, Passion and Simmons knew that Brown was to be consulted and failed to do so.

78.     B2, SSE, Shelley and Simmons had no right to license the footage to the other Defendants.

79.     Showtime, BBC, Passion, SSE, Shelley and Simmons was notified of the existence of Contract 1 in 2017 and continued to allow the film, "Can I Be Me" to be exhibited, distributed and broadcasted without the consent of RB.

79.     Showtime, BBC, Passion, SSE, Shelley and Simmons have harmed RB due to their actions.

WHEREFORE, The Plaintiffs demand a jury trial and the following:

1.     Judgment on all counts and amount to be determined by the Court;
2.     Interest;
3.     Attorneys Fees;
4.     Punitive damages;
5.     Injunctive relief; and,
6.     Any other relief this Court deems just and equitable.

ROBERT BROWN and THE
ESTATE OF BOBBI KRISTINA BROWN
By Their Attorneys,

Christopher Brown
CB3465
Brown & Rosen LLC
Attorneys At Law
100 State Street, Suite 900
Boston, MA 02109
617-728-9111 (T)
Dated: November 28, 2018                cbrown@brownrosen.com

# EXHIBIT A



# EXHIBIT B



# EXHIBIT C

**From:** Nick Broomfield [mailto:nick@nickbroomfield.com]
**Sent:** Wednesday, June 1, 2016 5:10 PM
**To:** cbrown@brownrosen.com
**Subject:** Interview request for Bobby Brown

Dear Chris

Following on from our phone conversation, I'm writing to you to request an interview with Mr Bobby Brown for a feature length documentary that we are making looking at the life of Whitney Houston.

I am particularly keen to do a positive piece that explains the life of Whitney in a loving and enlightening way. Many stories have already been told, but none so far have found a way to embrace the complexities of her life in a supportive way, that is an overall celebration of her short but amazing life.

We have a huge respect for Bobby Brown, his work as an artist and his achievements. We're of the firm belief that he has been judged very hard and would like to see this as an opportunity for him to tell his story from the heart. We can assure you we have no agenda and come in good faith.

If you have any further questions, please do not hesitate to call or email me.

Very best wishes,

Nick

# EXHIBIT D

https://www.weekendnotes.com/whitney-can-i-be-me-screening-exclusively-at-cinema-paradiso/

## Whitney: Can I Be Me - Screening Exclusively at Cinema Paradiso

**Event: 15/06/2017 - 21/06/2017**
**Setting the Record Straight**
**Whitney: Can I Be Me** is an extraordinary new documentary film about the life and demise of one of the most successful pop icons the world has seen. For me, a devotee of all things 80s pop culture and music, I was incredibly saddened to hear of the premature death of **Whitney Houston** in 2012.

The perception of the broken down, drug addict that Whitney became by the end of her forties, simply does not do her life or legacy justice. For true Houston fans, this documentary will right many a wrong in the defamation of her character.



*Publicity image for Whitney: Can I Be Me c/o- Whitney: Can I Be Me Facebook page*

Fact. Whitney Houston was a long-term drug addict and by her own admission, was her own biggest problem when it came to the drug and alcohol consumption. Like all good documentaries, **Whitney** presents a balanced view and it becomes clear that Bobby Brown was not solely responsible for her hopeless descent and though not a positive influence in her life, Whitney needed to take responsibility for her own choices and actions.



*Still c/o- the film Whitney: Can I Be Me - Whitney and Bobby shared a passionate and co-dependent relationship*

Fact. Despite the media and public opinion blaming Bobby Brown for corrupting the squeaky-clean pop princess, Whitney grew up in a family environment where drugs were easily accessible and became an everyday part of her life from early on. Members of her own family therefore have crosses to bear.

I didn't know this and before this documentary, I knew very little about Whitney's early life and her rise to fame. The documentary is revealing with never-before-seen backstage footage of her final successful world tour in 1999 but the interview excerpts taken from her public life also reinforce that she was a deeply private person. The world and her fanbase had no idea the depths of her own personal sadness, struggles and demons, which all impacted on what was inevitably her own self-destruction.



*Still c/o- the film Whitney: Can I Be Me - Whitney gave everything in her performances*

Director **Nick Broomfield** and iconic music video director **Rudi Dolezal** bring together a fascinating collection of interviews with the people in Whitney's inner circle including her stage manager mom **Cissy Houston**, **Tina Brown** (Bobby Brown's sister), a legal advisor to Whitney who wrote a report warning of her addictions, backing vocalists who toured extensively with the singer and **Robyn Crawford**, a close friend for 19 years and arguably the most stable influence in the star's tragically short life.

Fans of pop music history and Houston's achievements will be well-rewarded and no doubt very saddened by the journey on which this documentary takes them. It is in-depth and focuses less on the sensationalised events of her death than the path of her life from talented teenage gospel singer, to trailblazer for female African American pop singers, to deeply troubled wife, mother and finally, divorcee. At 1 hour 40 minutes, the producers do not rush Whitney's story and intriguingly chart the ups and the downs and the shades of grey of her 48 years.

And the best part? It will leave you remembering why you loved Whitney in the first place. Her beauty, her smile, her warmth and above all her other-worldly vocal talent, which was very real before her addictions left her without a voice later in her career.



*Still c/o- the film Whitney: Can I Be Me - The two faces of Whitney - perfection and sadness*

Her music legacy is what matters most of all. As consumers of pop culture, this was her gift to us. I hope history will be good to Whitney and not dwell *only* on her fall from grace. **Whitney: Can I Be Me** is an important step in preserving a necessary account of the truth behind the tabloids.

**Whitney: Can I Be Me is screening exclusively at Cinema Paradiso for one week only from June 15 to June 21.**

Purchase tickets **here**.

# EXHIBIT E

https://www.screendaily.com/reviews/whitney-can-i-be-me-tribeca-review/5116838.article

## Whitney 'Can I Be Me': Tribeca Review

BY FIONNUALA HALLIGAN, CHIEF FILM CRITIC26 APRIL 2017

- Save article

**It may be unauthorised, but Nick Broomfield's story of a beautiful diva's descent into drugs is certainly respectful**



*Dirs. Nick Broomfield, Rudi Dolezal. US/UK. 2016. 111 mins*

The little we know for certain about the life and death of Whitney Houston – at the age of 48 after a long battle with drugs, in a bath at the Los Angeles Hilton – is enough to predict that Nick Broomfield's unauthorised documentary *Whitney 'Can I Be Me'* will be a sad, sad story. It doesn't disappoint. Long for a doc, at 111 minutes, comprehensive - for the most part - *Whitney* foreshadows *Amy*, with the added top-note that the singer's 24 year-old daughter would die in similar circumstances less than three years later. Showbusiness eats its young, and their offspring as well.

### This should be required viewing for all those who might seek to follow Houston's path to fame and fortune - and their families

The first of two documentaries about Houston, who died in 2012, and a Showtime/BBC Two-financed production, *Whitney: Can I Be Me?* launches at the Tribeca Film Festival. Sold by Content Media, it is set for a limited UK theatrical run in mid-June. For all that it is unsupported by Houston's family - unlike Kevin Macdonald's upcoming doc, bought by TWC - it is also markedly respectful. Broomfield steps back from the type of interventions which made 1998's *Kurt and Courtney* so pointed. Then again, he doesn't need to say much: nobody comes away from *Whitney* looking good.  Her beloved father's deathbed lawsuit brings back memories of Mitch Winehouse, and then some.

With the exception perhaps of the singer's former personal assistant and lover Robyn Crawford (who appears in archive footage), Houston's family and associates are presented as complicit in her downfall. Broomfield mixes up old interviews with new, puts current-day voices over old clips and vice versa, and relies very heavily on previously unseen footage from Whitney's giant, global 1999 tour, the My Love Is Your Love, 64-date gig in which rumours of drug use started to leak out and Whitney, dressed in Dolce & Gabbana, began to slowly, publicly crack.

This tour forms the backbone of *Whitney 'Can I Be Me'* and is its strongest element. Troubled though she was, the extent of Whitney's talent and beauty, the physical workout and exertion and effort she put into her show, are impressively clear. Her complicated relationship with her

husband, Bobby Brown, her feelings for and exploitation of her daughter, and even the former gospel singer's relationship with God himself, are also apparent.

The most surprising part of Broomfield's doc for the uninitiated is how Whitney, presented by her record label and the media as pop royalty, a light-skinned gospel-singing breakout beauty who was the cousin of Dionne Warwick and the daughter of the ferocious Cissy Houston, was really a girl from the hood. Aged four when her family left Newark for East Orange after the riots, she was taking "drugs" with her brothers by her early teens (whether this was pot or harder drugs isn't specified: what is clear is that she was into stimulants long before she met the boozy Bobby Brown, and their addictions fed each other). Broomfield doesn't appear restricted, with early footage showing Whitney singing at church, and her mother taking the credit for her talent.

The Arista mogul Clive Davis, feted at Tribeca's opening night film and credited with discovering Whitney, appears here, but in archive footage only. He acknowledged that he tried to break out Warwick and Aretha Franklin in their day, but that Whitney was the only act able to transcend race, like Beyonce after her, and command a record seven consecutive number one songs in the US and the best-selling debut album by a woman in history. She was an unparalleled match of natural beauty with talent – her first ambition was to be a model .

The rest, however, is a familiar tale: the family she supported, the entourage, the record label demands and the drug problem which would consume her. Unique elements of a sad and sorry story include her perceived rejection by the black community for being too 'white': Broomfield posits that Whitney being booed at the 1989 Soul Train Awards led her directly to the more "street" Brown. Her doomed friendship with Robyn also comes to the fore, alongside her rise to stratospheric fame with the success of *The Bodyguard* in 1992. By 1995 she suffered her first cocaine overdose while making *Waiting to Exhale*, four years before the tour Broomfield extensively documents.

Broomfield backs himself into a corner by relying so heavily on this footage: structurally, *Whitney* tracks back from the 911 call at the Hilton Hotel to a childhood in Newark, Whitney's discovery, and relationship with Bobby Brown. There's even time for the queasy encounter on French TV between a young Houston and the drunken Serge Gainsbourg. Yet there were almost 13 years between the My Love Is Your Love tour and Houston's eventual death. Broomfield is

respectful inasmuch as only one sequence is shown of a clearly intoxicated Houston in Atlanta, and none of her daughter Bobbi Cristina from this period. Yet the imbalance does make his film feel incomplete, and the concert footage seem overbearing.

Having said that, there's little joy to be taken from 111 minutes of watching a beautiful, talented woman being preyed upon and picked apart, and it's hard to ask for more - one wonders what is left to be said in Macdonald's upcoming feature. *Whitney 'Can I Be Me'* delivers yet another tragic lesson in the toxic mix of fame and talent and children: it should be required viewing for all those who seek to follow this diva's path to fame and fortune. After which, it's sad to say, few would want to be her.

Production companies: Passion Pictures, Lafayette Films

International sales: Content Media, jonathan.ford@contentmediacorp.com

Producers: Nick Broomfield, Marc Hoeferlin

Executive producers: Marc Hoeferlin. John Battsek, Shani Hinton, Charles Finch, Ben Silverman, Patrick Holland

Cinematography: Sam Mitchell

Editor: Marc Hoeferlin

Music: Nick Laird-Clowes

Topics

- Documentaries
- Tribeca
- UK/Ireland
- United States

# EXHIBIT F

https://www.theroot.com/whitney-can-i-be-me-succeeds-in-not-exploiting-but-cel-1794755155

## *Whitney: Can I Be Me* Succeeds in Not Exploiting but Celebrating Whitney Houston's Life

Demetria Lucas D'Oyley
4/29/17 10:00am
Filed to: CultureFiled to: Culture

- Culture
- whitney houston
- whitney can i be me review
- whitney houston documentary
- showtime
- music
- bobby brown
- 52

Kevork Djansezian/Getty Images
As the Tribeca Film Festival rolls through New York City this week and next, perhaps no film has been more anticipated or controversial than *Whitney: Can I Be Me* , an inside look at troubled pop icon Whitney Houston. At the world premiere of the film Wednesday evening, directors Nick Broomfield and Rudi Dolezal (no relation to Rachel, before you wonder), who documented Houston during a world tour, announced before the film was shown at 5:45 p.m. that they had received clearance to air it just three hours before the scheduled screening. Broomfield declined to give details on the conflict, but adamantly thanked his lawyers for making the film possible *that evening.*

Given the announcement of behind-the-scenes drama, I watched expecting startling revelations the general audience wouldn't know about the late pop singer, who died in 2012. Throughout Houston's career, she was plagued with rumors about her sexuality and confirmed reports (by her) of her drug use and her tumultuous marriage to Bobby Brown, whom she dubbed "the King of R&B." *Whitney: Can I Be Me* (the title is a nod to a favorite saying of hers, according to close friends) actually covers thoroughly trod terrain when it comes to Houston. If you're looking for bombshell revelations, there aren't many.

████████████████████████████████████████

00:00
00:00
00:00

████████████████████████████████████████

What the film offers are more details about the overall behind-the-scenes drama that the public has been privy to through countless interviews and books from various members of Houston's inner circle. If you're looking for "tea," what you'll get is a weak second pour from the pot. The film all but concludes that she was bisexual, which tabloids had reported for years. Her former bodyguard delves into the explosive relationship between Brown and Robyn Crawford, a close friend of Houston's who was oft rumored to be her girlfriend. The spats between Brown and Crawford occasionally led to physical altercations. The new news? Sometimes Crawford won. There are more details about the drug use that occurred during Houston's world tour, which ultimately earned poor reviews because of her erratic behavior and when she missed her high notes. And there are never-heard-before accounts of just how awful Brown could be to Houston when he was high (in short, he played on her insecurities) and that he was angry when she got sober. But these new details are dull in comparison with Houston's own account of their rocky relationship during a sit-down with Oprah Winfrey in 2009, when she recounted the time Brown spit on her.

Perhaps the biggest controversy here is that the doc explicitly blames Houston's inner circle for her demise and ultimate death. Yes, she consumed the drugs, and had been doing so since around age 18. And yes, she was plagued by common demons: a controlling mother, a desperation to be liked and insecurities about her appearance. And yes, again, she struggled with success and its effect on her marriage (she downplayed her success to compensate for her husband's ego).

Advertisement

But when she began to obviously spiral because of addiction, the documentary asserts, few people intervened, including her family who were on her payroll and needed Houston to keep performing and bringing in money. Houston's bodyguard David Roberts, who accompanied her during the disastrous world tour when her voice was shattered, sent a detailed letter to her management team begging for them to help, only to be fired for speaking up.

*Whitney* also includes never-seen-before concert footage of her 1999 world tour, when she was still at the top of her game. Dressed fabulously in Dolce & Gabbana**,** she belts out hit after hit in her immediately recognizable and pitch-perfect voice. It's a final glimpse of the Whitney Houston who paved the way for our current black pop princesses and the one audiences fell in love with. But the ultimate point of *Whitney* isn't to exploit or blame or even to celebrate her vocal prowess. In a way, it's to humanize her again. In her later years, Houston's drug use overshadowed her career and turned the onetime pop princess into more of a punchline. But behind the icon and before, after and even during the drug use, Houston was adored by those who knew her best. And it's easy to see why.

Advertisement

She is silly and sweet and relatable in the film, a voracious eater, who squeals in delight over watching *Set It Off*. One of her favorite pastimes is re-enacting film scenes with her husband. Their favorites include Ike and Tina Turner from *What's Love Got to Do With It* and Mickey and Mallory Knox, the dysfunctional couple from *Natural Born Killers*. Go figure.

She ached from missing her daughter while on tour and sent her dolls to try to compensate. She deeply loved Bobby Brown, despite the way he treated her at his worst. She was wrecked when he began dating after their 2006 divorce.

Despite the drama, despite the drugs, despite "the Voice," in scene after scene (after scene), the point is driven home: The real tragedy of Whitney Houston's death isn't the loss of a superstar; it's the unnecessary and far-too-soon death of a mother, daughter and lovable friend.

Advertisement

*Whitney: Can I Be Me* will air on Showtime in August.

# EXHIBIT G

**From:** Tracey Baker-Simmons <tbakersimmons@me.com>
**Subject: B2 Brownhouse Co-Production Agreement**
**Date:** April 27, 2015 at 8:47:28 AM EDT
**Cc:** Wanda Shelley <wanda@simmonsshelley.com>
**To:** cbrown@brownrosen.com

Chris:

Please find attached the co-production agreement which outlines the talent fee for Bobby for the Being Bobby Brown series.

Also, we can not provide you with the actual distribution agreement because we signed an agreement that prohibits us from sharing the document with a 3rd party. Bobby was not a party of that agreement.

Best regards,

Tracey Baker-Simmons
Executive Producer
Simmons Shelley Entertainment,LLC

<u>AGREEMENT</u>

This letter dated as of March 25, 2004 confirms the terms of the development and co-production agreement reached between B2 Entertainment, LLC ("B2") and Brown House Entertainment, Inc. ("Brownhouse") in connection with the development, distribution, disposition and exploitation of the proposed television reality project currently entitled "Untitled Bobby Brown Project" (the "Project").

WHEREAS, the parties have formed an entity, B2Brownhouse, LLC, which is owned and controlled equally by B2 and Brownhouse, for the purpose of developing, distributing and producing the Project (the "Company"); and

WHEREAS, B2 shall enter into a production services agreement and shall provide the initial funding for the Project; and

WHEREAS, Brownhouse has agreed to loan-out the services of Bobby Brown ("Bobby") and Tommy Brown ("Tommy") (Bobby and Tommy shall be collectively referred to as "Artist"), as well as obtain fully executed agreements with all of the principal on-camera participants in connection with the Project.

NOW THEREFORE, for good and valuable consideration, the parties have agreed as follows:

1.      <u>Development/Production</u>: B2 and Brownhouse agree to develop the Project or cause the Project to be developed for exploitation and to procure third party commitments for the production and/or distribution of the Project for a period commencing from the date

of this agreement through and until December 31, 2004 (the "Term").   All rights in and to the Project during the Term shall be held by Company.

2.    Services:

a.    By B2:

   i.    B2 shall provide 100% of the initial funding for the Project (the amount of which shall be determined based on a budget to be provided by B2) (the "Initial Investment"); and

   ii.    B2 agrees to provide the services of Tracey Y. Baker ("Tracey") and Wanda Shelley ("Wanda") to supervise all production services and technical assistance which Company may require in connection with the production of the Project. Without limiting the generality of the foregoing, the services shall include: the hiring and/or furnishing of all personnel (including, without limitation, extras, stunt persons and other above-the-line personnel and below-the-line personnel); services; unions; location permits; work permits; facilities; equipment and materials reasonably necessary for the production.

b.    By Brownhouse:

   i.    Brownhouse shall lend the services of Artist, and Artist shall perform on-camera talent services on an exclusive basis during all periods of production and Artist shall undertake no services that would materially interfere with Artist's services hereunder. Artist grants to Company the right to use, film, tape and otherwise record events relating to or occurring in Artist's life and portions of Artist's life story including without limitation any relationships with family, friends, employers and the like during and after all phases of production of the Project, so that Company can produce episodes of the Project, and so that Company can distribute, exhibit and/or otherwise use the Project and/or other works, productions and materials based thereon.  Brownhouse shall cause Artist to: meet with and be interviewed from time-to-time by Company and other Project personnel, both on-camera and off-camera in connection with the Project; appear at such locations as Company and Artist may designate; participate in connection with promotion, marketing, advertising, publicity, interviews and similar matters (e.g., appearing on news shows, morning shows, talk shows, specials, and other programs) in connection with the Project; and perform such other services and Company and Artist may determine; and

   ii.    Brownhouse shall cause Artist to grant to Company a perpetual, royalty free license to include music performed, recorded and/or controlled by Artist in the Project, and Artist agrees to obtain, or cause the music publisher, record label or third party to obtain, any and all consents required for those musical compositions performed by the Artist in

34

connection with the Project and/or in or in connection with the advertising and promotion thereof and the Project.

3.     Proceeds:  After B2 recoups the Initial Investment, plus ten percent (10%), all proceeds derived by Company from the distribution, disposition and exploitation of the Project shall be shared equally (50%/50%) by B2 and Brownhouse.  Proceeds shall include development fees or producing and all other income from all sources; provided that any acting or executive producing fees paid to Tracey and/or Wanda, as well as any acting fees paid to Bobby Brown and/or Tommy Brown, if any, in connection with the Project shall not be included in the Proceeds to be split by the parties.

4.     Management:    B2 and Brownhouse shall negotiate with a third party financier/distributor as a team and shall mutually agree on all material decisions in connection with the development, distribution, disposition and exploitation of the Project; provided that in the event of a disagreement between the parties, B2 shall have final decision-making authority.

5.     Credit:

a.      Individual Credit.  The parties agree that, in connection with the Project and subject to network and/or distributor approval, Tracey and Wanda shall be accorded executive producer credit in the main titles, or if no main titles, in the end titles, and Bobby and Tommy shall each be accorded co-executive producer credit on-screen, on a shared card in the main titles, or if no main titles, in the end titles.

b.      Company Credit.  The parties agree that B2 and Brownhouse shall be entitled to a presentation and logo credit in connection with the Project in the main titles, or if no main titles, in the end titles.

6.     Confidentiality:  Except where required by law, both parties shall keep confidential the Project and any ideas, concepts, stories plots, themes or other material related to the Project unless express written consent is provided by the parties.  Neither party shall: circumvent the other's role and anticipated financial compensation in connection with the Project or other unscripted television programs; negotiate a side deal with any third party in the which does not include the other party; or any way attempt to circumvent the spirit and intent of this Agreement.

7.     Miscellaneous:  This agreement sets forth the entire agreement of the parties and supersedes all prior discussions, agreements or understandings regarding its subject matter. This agreement may be amended only by a written instrument signed by each of the parties. This agreement will be governed by California law.  This agreement will inure to the benefit of and bind the parties and their respective heirs, executors, administrators, successors and permitted assigns.

35

The parties agree to execute such other documents as may be necessary to secure the rights contemplated hereunder.  The parties contemplate that they will enter into a more elaborate agreement containing the terms recited in this agreement and such other provisions as are customary and appropriate in agreements of this nature.  Unless and until the parties actually negotiate and sign such an agreement, if at all, this agreement will be deemed binding.

ACCEPTED AND AGREED:

B2 ENTERTAINMENT,LLC                    BROWNHOUSE      ENTERTAINMENT,
INC.

By:_____             By: _____
Its: _____           Its: _____

By:_____             By: _____
Its: _____           Its: _____

B2BROWNHOUSE, LLC

By:_____             By: _____
Its: _____           Its: _____