UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| ROBERT BROWN and THE ESTATE OF BOBBI KRISTINA BROWN | ) |
| | ) |
|         Plaintiffs | ) Action No. |
| v. | )  18-CV-11078-CM |
| | ) |
| SHOWTIME NETWORKS, INC., | ) |
| BRITISH BROADCASTING CORPORATION, | ) OPPOSITION TO |
| PASSION PICTURES CORP, TRACEY BAKER-SIMMONS, WANDA SHELLEY,  B2 | ) MOTION TO DISMISS OF ) SHOWTIME NETWORKS, INC. |
| ENTERTAINMENT LLC and  SIMMONS SHELLEY | ) AND BRITISH |
| ENTERTAINMENT, LLC | ) BROADCASTING |
|         Defendants | ) CORPORATION |

_____)


# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT


Christopher Brown
Brown & Rosen LLC
100 State Street, Suite 900
Boston, MA 02109
(T) 617-728-9111
cbrown@brownrosen.com


*Counsel for Plaintiffs*

Dated:  May 2, 2019

TABLE OF CONTENTS

I. INTRODUCTION                                                              1

II. FACTS                                                                    1

III. ARGUMENT                                                               7

A. Factual Considerations Relating to Rule 12(b) Motions.                   7

B. Brown's Litigation Against TV One LLC Is Irrelevant
and Unrelated To This Matter.                                               8

C. Defendants Have Violated Brown's Statutory and Common
Law  Right to Publicity.                                                    9

D. The First Amendment Does Not Warrant Dismissal of Plaintiffs
Right to Publicity Claims.                                                  16

E. Defendants Have Violated Georgia's Common Law Right To
Publicity In Regards To The Estate Of Bobbi Kristina Brown And
The First Amendment Does Not Protect The Defendants' From Liability.        20

F. Defendants Have Violated The Lanham Act With Their Unauthorized
Use of Plaintiffs Likeness and Voices and Their Actions Are Not Protected
By The First Amendment.                                                     22

    1. Use Of Plaintiffs Marks Are Not Consist With  The Rogers
    Or The Gordon's Analysis of Artistic Relevance In Regards
    To Source and Content.                                                  23

    2. The Defendants Have Been Misleading As To Content Of The Film.       24

G. Brown Contract with B2 Entertainment LLC Has Been Breached.              25

H. Plaintiffs Have Properly Plead An Interference With Contractual Relations Count.  27

I. This Court Has Jurisdiction Over the BBC.                                28

    1. There Is General Jurisdiction Over BBC.                              31

    2. There Is Specific Jurisdiction Over BBC.                             32

J. The Declaration of Clive Illenden Must Be Stricken.                    34

IV. CONCLUSION                                                            34

# TABLE OF CITATIONS

**Cases**

*Albert v. Apex Fitness, Inc.*, No. 97 Civ. 1151 (LAK), 1997 WL 323899, at *1
(S.D.N.Y. Jun. 13, 1997)                                                              22

*Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*,
No. 04 Civ. 6107 (DAB), 2006 WL 2289847, at *10-11 (S.D.N.Y. Aug. 8, 2006)            22

*Alonso v. Parfet*, 325 S.E. 2d 152 (Ga. 1985)                                        4, 20

*Bell v. Foster*, 2013 WL 6229174 (N.D. Ga. 2013)                                     20

*Bret Michaels v. Internet Entertainment Group, Inc.,* F. Supp. 2d 823,
1998 U.S. Dist. Lexis 10678 (District Court CA April 28, 1998)                        27

*Brown v. TV One LLC et al.*, S.D.N.Y. Case No. 1:17-cv-06824-AT                       8

*Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners,*
*LLC*, 829 F. Supp. 2d 836, 845-46 (D. Minn. 2011)                                    26

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472,
105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)                                                 30, 31

*Byrne v. BBC*, No. 00-CIV-3141 (SHS) (SDNY); 132 F.Supp.2d 229 (2001)                 32

*Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)                30, 31

*Cher v. Forum Int'l Ltd.*, 692 F.2d 634 (9th Cir. 1982),
cert. denied, 462 U.S. 1120 (1983)                                                    13-15

*Clark v. Celeb Publishing, Inc.,* 530 F. Supp. 979 (S.D.N.Y. 1981)                    14, 15

*Comedy III Prods. v. Gary Saderup Inc.*, 25 Cal. 4th 387 (Cal. 2001)                 16-18

*Daimler AG v. Bauman*, 134 S. Ct. 746 (2014)                                         28,29,31

*Davis v. Electronic Arts*, No. 12-15737 (9th Cir. Court of Appeals,
Decided January 6, 2015)                                                              16

*Dora v. Frontline VideoInc.*, 15 Cal. App. 4th 536, 18 Cal Rptr. 2d 790 (1993)       15

*Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 198 Cal. Rptr. 342 (1983)         9,12,13,15

*Gill v. Hearst Publishing Co.,* 40 Cal. 2d 224  253 P.2d 441 (1953)                                      15

*Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (Cal. Ct. App. 2001)       15

*Gordon v. Drape Creative Inc.,* No. 16-56715 (9th Cir. July 30, 2018)                  23-25

*Gross v. BBC*, 386 F.3d 224 (2nd Cir. 2004)                                                               32, 33

*Imation Corp. v. Sanho Corp.*, No. 15-1883 (JRT/JSM), 2016 WL
4179363 at *3 (D.Minn.Aug 5, 2016)                                                                          33

*ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493 (5th Cir. 2012)                           29

*Hart v. Electronic Arts*, 717 F.3d 141 (3rd Cir. 2013)                                         16, 18

*Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192 (D.D.C. 2010)          27

*Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602 (5th Cir. 2008)             28

*Kareem Abdul-Jabbar v. General Motors Corp.,* 85 F.3d 407 (9th Cir. 1996)   10,11,15

*Keller v. Electronic Arts*, 2013 DJDAR 10071 (9th Cir. 2013)                          17, 18

*Kelly v. Syria Shell Petroleum Dev., B.V.*, 213 F.3d 841 (5th Cir. 2000)          29

*Knowlton v. Shaw*, 708 F. Supp 2d 69 (D. Me 2010)                                             7

*Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465 (5th Cir. 2006)                  28

*MacDermid, Inc. v. Deiter*, 702 F.3d 725 (2d Cir. 2012)                                    33

*Martin Luther King, Jr. Center for Social Change, Inc. v.
American Heritage Products, Inc.,* 296 S.E.2d 697 (1982)                                  20

*Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894 (9th Cir.2002)                      23

*Mattel, Inc. v. Walking Mountain,* 353 F.3d 792 (9th Cir 2003)                       23

*Melvin v. Reid*, 112 Cal. App. 285, 290 [297 P. 91] (1931)                                 15

*Midler v. Ford Motor Co.,* 849 F.2d 460 (9th Cir. 1988), cert. denied sub
nom *Young Rubican, Inc. v. Midler*                                                                        11-13,15

*New Kids on the Block v. News America Publishing, Inc.*,
971 F.2d 302 (9th Cir. 1992)                                                                                   24

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118 (1990)          27

*Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437 (1952)          29

*Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 343 (5th Cir. 2002)          28

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1999)          16,18,23-25

*Saldana v. Kmart Corp.*, 260 F.3d 228 (3rd Cir. 2001)          7

*Sokolow v. BBC*, 1:2011mc00547 (EDNY)          32

*Thoroughbred Legends, LLC v. The Walt Disney Co*,
NO. 1:07-CV-1275-BBM, 2008 WL 616253, AT *11 (N.D. GA. FEB. 12, 2008)          21

*Toffoloni v. LFP Pub. Grp., LLC*, 572 F.3d 1201 (11th Cir. 2009)          20

*Valencia v. Universal City Studios LLC*, NO. 1:14-CV-00528-RWS, 2014
WL 7240526, AT *8 (N.D. GA. DEC. 18, 2014)          21

*Waits v. Frito-Lay, Inc.,* 978 F.2d 1093 (9th Cir. 1992),
cert. denied, 506 U.S. 1080 (1993)          11, 15

*Warner Bros. Entm't Inc. v. Ideal World Direct*,
516 F. Supp. 2d 261 (S.D.N.Y. 2007)          22

*Whatru Holdings, LLC v. Bouncing Angels.,* No. 13-2745 (JNE/TNL),
2014 WL 641517 at *3 (D. Minn. Feb 19, 2014)          33


**Treaties and Statutes**

California Civil Code Section 3344          9, 13

J. Thomas McCarthy, McCarthy on Trademarks and
Unfair Competition §28:15 (4th ed. 1996)          22

New York Law. N.Y. Gen. Constr. Law section 12 (McKinney)          33

N.Y. C.P.L.R section 2309          33

Prosser, Law of Torts (4th ed. 1971) § 117          9

## I.     INTRODUCTION

Defendants' Motion To Dismiss the Complaint must be denied by this Court.  The actions of the Defendants have harmed the Plaintiffs as they have violated the Plaintiffs' (1) rights to publicity/privacy (2) violated the Lanham Act and  (3) intentionally violated contractual rights of the Plaintiffs.  The Defendants have engaged in an intentional tort and have purposely used and continue to use film footage despite knowing they do not have the consent of the Plaintiffs' to use the footage.   In the instant Motion To Dismiss, the Defendants' do not deny using the footage without the consent of the Plaintiffs, instead, the Defendants' argue that the use of the footage is protected by the First Amendment.  The Defendants argue that the First Amendment supersedes Plaintiffs statutory, common law and contractual rights, and argue that this Court does not have jurisdiction. These arguments are without merit, mandating the denial of the Defendants Motion To Dismiss.

## II.     FACTS

1.      Robert "Bobby" Brown ("Brown" or "RB") is the legendary singer of the group "New Edition" and had a solo career that has led to the sale of millions of albums. Brown is also the ex-husband of Whitney Houston ("Houston").  Bobbi Kristina Brown ("BKB") is the daughter of Brown and Houston.

2.      In 2017, the Defendants promoted, distributed, the film "Can I Be Me" an alleged documentary of the Houston, the R&B singer who died in 2012.

1

3.      The film contains footage that Brown and BKB has never consented to have

released. Brown and BKB appear in the film for a substantial period of time, in excess of

thirty (30) minutes.

4.      The footage was actually recorded prior to the divorce in 2007 between Brown

and Houston. Brown never signed or executed a release for the airing of the material that

appears in the film. The footage of Brown is approximately fifteen (15) years old.

5.      Upon information and belief, in addition to Brown and BKB, many others in the

film never signed releases for their images to be in the film. Generally filmmakers seek

to obtain video release forms and to get them signed by individuals who speak on camera

if you shoot video of a private, non-public event.  Brown and BKB did not sign video

release forms. Assuming that Plaintiff have proper title to the footage, they do not have

proper title to its contents.

6.      Showtime Network Inc. ("Showtime") and the British Broadcasting Corporation

("BBC") distributed "Can I Be Me" in August 2017 without the consent of the Plaintiffs

or their approval to appear in the film. The film has aired all over the world.

7.       The BBC is airing "Can I Be Me" in the United Kingdom without the consent of

the Plaintiff. http://www.bbc.co.uk/mediacentre/proginfo/2017/36/whitney-can-i-be-me .

See Exhibit "A" to Complaint. The BBC unlawfully obtained the film from Passion

and/or its affiliates.

 8.      Upon review of the credits that aired at the conclusion of the film "Can I Be Me",

the defendants allege that Brownhouse Entertainment, Inc. ("Brownhouse"), Brown's

2

company is credited, indicating/suggesting that Brownhouse provided and approved footage for the film.   See Exhibit "B" to Complaint.  Plaintiff did not provide any footage for the film and does not consent to any of its footage being used.

9.      Upon information and belief, Defendants BBC, Showtime or its affliates have licensed the film "Can I Be Me" to Arsenal Filmyerleih in Germany, Eagles Pictures in Italy and Periscoop Film in the Netherlands without the consent of the Plaintiffs. All the Defendants are keenly aware that the life of the  Plaintiffs and Houston are very valuable and of interest to the public.

10.      The film also contains images of RB, BKB and RB's other children, Landon Brown, Robert "Bobby" Brown Jr. and LaPrincia Brown as minor children.  Brown never consented to have his children appear in the film "Can I Be Me" and his children never consented.

11.      The film also contains segments in which RB and BKB (as a minor child) are singing and performing on stage. The Plaintiffs have never consented to having the material appear in the film "Can I Be Me" and never cleared the music or performances of RB or BKB in the film.

12.      The Defendants' have violated RB rights to publicity and privacy.

13.      BKB died in 2015 in the state of Georgia.

14.     Georgia's courts have developed a common law right of publicity. Various Georgia court decisions refer to the "right of publicity," "misappropriation of likeness," and similar terms.

15.     Georgia's right to publicity survives death.

16.     Georgia's right of publicity protects against unauthorized uses of a person's identity "for financial gain."  In *Alonso v. Parfet*, the Georgia Supreme Court further ruled that use of a person's name on "various forms and documents" used in the course of business could establish a violation. 325 S.E. 2d 152 (Ga. 1985).

17.     The Estate of BKB did not consent to the release of the film and the Defendants have violated the right of BKB. The Defendants are using the life, image, name and likeness of BKB for financial gain in violation of rights of the Estate of BKB.

18.     In June 2016, Nick Broomfield ("Broomfield"), a producer associated with Passion, requested that Brown provide an interview for an upcoming Houston film.  See Exhibit "C" to Complaint.  RB declined the request. The Defendants knew of RB's desire not to be a part of the Defendants' film, however they utilized his name, likeness and persona in the film without his consent.

19.     Leading to the release of the film, the Defendants utilized the name, persona and likeness of RB in the marketing, and promotion of the film.  The promotion of the film by the Defendants included providing screeners before the actual release date  of  the film and providing the press with the opportunity to review the film before the release date and commit on the manner in

4

which RB is depicted in the film in advance of the release.  This was part of the marketing

strategy of the defendants. https://www.weekendnotes.com/whitney-can-i-be-me-screening-

exclusively-at-cinema-paradiso/ ; https://www.cbscorporation.com/events/whitney-can-i-be-me-

screening/ ; https://www.screendaily.com/reviews/whitney-can-i-be-me-tribeca-

review/5116838.article Exhibits "D"- "F" to the Complaint. Upon information and belief, the

defendants gave screeners of the movie to the press prior to the release of the film, which

depicted RB in order to have the press prepare reviews that included RB as part of the marketing

of "Can I Be Me" publicly.


20.	In 2004, RB through his company Brownhouse Entertainment, Inc.

("Brownhouse") (dissolved), and Wanda Shelley ("Shelley") and Tracey Baker-

Simmons ("Simmons") through their company B2 Entertainment LLC ("B2")

(dissolved) (collectively the "SSE Defendants"), signed an agreement for the creation of

the television series, "Being Bobby Brown" ("Contract 1"). The show aired on Bravo for

one season.


21.	Pursuant to Contract 1, B2 agreed not to use any materials associated with

Brown's family friends or employers without his consent in tv or film projects.  Section

2(b) and section 6 on the Agreement reads as follows:

Section 2 (b) on the Contract

     b.	<u>By Brownhouse</u>:

         i.	Brownhouse shall lend the services of Artist,
and Artist shall perform on-camera talent services on
an exclusive basis during all periods of production and
Artist shall undertake no services that would materially

interfere with Artist's services hereunder.  Artist grants
to Company the right to use, film, tape and otherwise
record events relating to or occurring in Artist's life
and portions of Artist's life story including without
limitation any relationships with family, friends,
employers and the like during and after all phases
of production of the Project, so that Company can
produce episodes of the Project, and so that Company
can distribute, exhibit and/or otherwise use the Project
and/or other works, productions and materials based thereon.

6.      Confidentiality:  Except where required by
law, **both parties shall keep confidential the Project and any
ideas, concepts, stories plots, themes or other material related
to the Project unless express written consent is provided by
the parties.  Neither party shall: circumvent the other's role
and anticipated financial compensation in connection with
the Project or other unscripted television programs; negotiate
a side deal with any third party in the which does not
include the other party; or any way attempt to circumvent the
spirit and intent of this Agreement.**

See Exhibit "G" to Complaint.[1]

22.      BBC and Showtime have utilized footage provided by Simmons, Shelley, B2 and

Shelley-Simmons Entertainment LLC (also "SSE Defendants") that was obtained by B2

while working with RB on "Being Bobby Brown" and have utilized the material in the

film "Can I Be Me". This includes information about WH, BKB, RB and others. The

Defendants have not obtained the written consent of RB for the usage of the "Being

Bobby Brown" footage in the film.

23.      The SSE Defendants have (1) circumvented RB's role (2) have negotiated a side

deal with a third party to make the BKB project with includes information obtained and

associated with the show "Being Bobby Brown" and  (3) circumvented the spirit and

---

[1] In the Answer to Complaint by Tracy Baker-Simmons, SSE, B2 and Wanda Shelley, they admit the existence of the Contract with Brown.  Docket Number 27 paragraph 5.

intent  of the Agreement in violation of paragraph 6 of the Agreement by utilizing

information, concepts, ideas , materials  and footage obtained during the production of

"Being Bobby Brown" to make the movie "Can I Be Me" without the consent of RB.

24.     Brown and his company performed their obligations under Contract 1. B2,

Shelley and Simmons have provided footage of "Being Bobby Brown" to the Defendants

in violation of the agreement reached in 2004.  As B2 was dissolved before 2009, SSE ,

Shelley or Simmons had no rights to the "Being Bobby Brown" footage and had no

rights to license or assign the footage to the other Defendants.

25.     All the Defendants were informed in 2017 that the Plaintiffs' rights have been

violated, however, the Defendants continued to air the film with the knowledge that the

use of the Plaintiff images and likeness were not authorized.

## III.   ARGUMENT

## A. Factual Considerations Relating to Rule 12(b) Motions.

In ruling on a Motion To Dismiss, a Court is required to accept as true all the factual

allegations in the Complaint and construe all reasonable inferences in favor of the Plaintiffs.

*Knowlton v. Shaw*, 708 F. Supp 2d 69, 74 (D. Me 2010).  All of the fact delineated above must

be reviewed in the light most favorable to the Plaintiffs.  See *Saldana v. Kmart Corp.*, 260 F.3d

228, 232 (3rd Cir. 2001).

As the Complaint establishes, Showtime and the BBC unlawfully used footage of the

Plaintiffs in the movie "Can I Be Me" in violation of Plaintiffs' rights to publicity/privacy, the

Lanham Act and committed the intentional tort of interfering with Contract 1.

**B. Brown's Litigation Against TV One LLC Is Irrelevant And Unrelated To This Matter.**

Showtime and the BBC makes reference to an Preliminary Injunction Hearing in *Brown v. TV One LLC et al.*, S.D.N.Y. Case No. 1:17-cv-06824-AT. The reference to the matter is of no consequence.  Brown filed for a preliminary injunction in the *TV One LLC* before any discovery occurred and before the film aired.   TV One LLC did not provide the Court with a copy of the film prior to or during the preliminary injunction hearing, despite Brown's request to have the film viewed by the Court. Soon after the film aired in 2017 it was discovered that the film's opening credits indicated that persons were "invented" for the purpose of the film and that events were "fictionalized" in the alleged biography of Bobbi Kristina Brown.  See Exhibit A to the Affirmation of Christopher Brown dated, May 2, 2019.  The film contained all actors. Soon after the film aired on TV One, the parties entered into a Confidential Settlement Agreement.

In the current litigation against Showtime, BBC and the SSE Defendants, the SSE Defendants have filed an Answer and indicated the existence of Contract 1 which bars the use of the Plaintiffs images, voice and likeness from the television program "Being Bobby Brown" in any other production without Brown's consent. The Defendants film, "Can I Be Me" contains footage from "Being Bobby Brown" and has no actors.

Showtime's Motion to Dismiss in this litigation which uses the images, likeness and voices of the Plaintiffs, is a vastly different litigation and unrelated to the preliminary injunction hearing filed by *TV One LLC*. The only similarity is that the Defendants are represented by the same law firm. Furthermore, the legal standards for the injunction in *TVOne LLC*, and the Defendants' motion to dismiss are vastly different, establishing the irrelevance of the *TVONE LLC* decision.

## C. Defendants Have Violated Brown's Statutory and Common Law Right to Publicity.

The basis for the right of publicity is the idea that every person should have the right to control how their identity, likeness, personality, voice, name or image is commercialized by others.  The California Court of Appeals stated that the common law right of publicity cause of action  and California Civil Code § 3344 statutory right  "may be pleaded by alleging (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 198 Cal. Rptr. 342 (1983)(citing Prosser, Law of Torts (4th ed. 1971) § 117, pp. 804-807). Defendants argue that the film is an expressive work of public interested protected by California statute.  The argument is without merit.

The statute reads as follows:

**California Civil Code Section 3344:**

> '3344. Use of Another's Name, Voice, Signature, Photograph,
> or Likeness in Advertising or Soliciting Without Prior Consent.
>
> (a) Any person who knowingly uses another's name, voice, signature,
> photograph, or likeness, in any manner on or in products, merchandise,
> or goods, or for purposes of advertising or selling, or soliciting purchases
> of products, merchandise, goods or services, without such person's
> prior consent, or, in the case of a minor, the prior consent of his parent
> or legal guardian, shall be liable for any damages sustained by
> the person or persons injured as a result thereof. In  addition, in any
> action brought under this section, the person who violated the section
> shall be liable to the injured party or parties in an amount equal to the
> greater of seven hundred fifty dollars ($750) or the actual damages
> suffered by him or her as a result of the unauthorized use, and any
>  profits from the unauthorized use that are attributable to the use
>  and are not taken into account in computing the actual damages.
>  In establishing such profits, the injured party or parties are required
> to prove his or her deductible expenses. Punitive damages may also
> be awarded to the injured party or parties. The prevailing party in

9

any action under this section shall also be entitled to attorney's fees
and costs.

The relevant case law clearly supports Plaintiffs' position  that Brown's statutory and
common law rights to publicity has been violated and are not subject the expressive works
exemption as the defendants contend. The case law  is as follows:

***Kareem Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407 (9th Cir. 1996)**.

The Ninth Circuit held, in *Kareem Abdul-Jabbar*, that abandonment is not a viable
defense to a right of publicity claim. Kareem Abdul-Jabbar sued General Motors and its
advertising agency for violations of the Lanham Act and his statutory and common law rights of
privacy based on an Oldsmobile television commercial that aired during the NCAA basketball
tournament. As an NCAA corporate sponsor, Oldsmobile referred, in the format of a trivia quiz,
to an NCAA record: Lew Alcindor's selection as Most Outstanding Player in three NCAA
tournaments. The United States District Court for the Central District of California, Judge Irving
Hill, granted summary judgment to General Motors on the grounds that Abdul-Jabbar had
abandoned his rights to the name Lew Alcindor by legally changing his name and refraining
from all commercial or other use his birth name. The Ninth Circuit reversed,  holding that a legal
name change is not a defense to Lanham Act ' 43(a) false endorsement or a right of publicity
claim: "We hold that Abdul-Jabbar has alleged sufficient facts to state a claim under both
California common law and section 3344. The statute's reference to 'name or likeness' is not
limited to present or current use. To the extent GMC's use of the plaintiff's birth name attracted
television viewers' attention, GMC gained a commercial advantage." Ab*dul-Jabbar*, 85 F.3d at
415.

10

**Waits v. Frito-Lay, Inc., 978 F.2d 1093 (9th Cir. 1992), cert. denied, 506 U.S. 1080 (1993).**

In *Waits*, the Ninth Circuit affirmed a $2.5 million verdict against Frito-Lay and its advertising agency on a voice imitation claim. Singer Tom Waits sued Frito-Lay claiming false endorsement under the Lanham Act and misappropriation of his voice in a Frito-Lay radio commercial. After trial before Judge James Ideman in the United States District Court (Central District of California), the jury returned a $2.5 million verdict in Waits' favor comprised of $375,000 in compensatory damages, $2 million in punitive damages, and the remainder in attorneys' fees. The Ninth Circuit affirmed, citing its holding in *Midler v. Ford Motor Co.,* 849 F.2d 460, 463 (9th Cir. 1988): "when a distinctive voice of a professional singer is widely known and is deliberately imitated in order to sell a product, the sellers have appropriated what is not theirs and have committed a tort in California." The court also affirmed the $2 million punitive damages award finding that defendants consciously disregarded Waits' right to control his identity. *Waits*, 978 F.2d at 1105. In affirming the compensatory damage award, the court referred to clear evidence of Waits' outspoken public stance against doing commercial endorsements, his embarrassment when the commercial aired, and the injury to his good will and future publicity value. *Id*. at 1103-1104.

**Midler v. Ford Motor Co., 849 F.2d 460 (9th Cir. 1988), cert. denied sub nom *Young Rubican, Inc. v. Midler*.**

In this 1988 decision, the Ninth Circuit "recognized," a California common law right of publicity proscribing imitations of a professional singer's voice for commercial purposes. Singer Bette Midler sued Ford Motor Company and its advertising agency based on a television commercial employing a "sound alike" vocalist performing one of Midler's well known hit songs, "Do You Want to Dance." The United States District Court for the Central District of

11

California, Judge Ferdinand F. Fernandez, entered summary judgment in favor of defendants, following a then established line of cases holding voice imitation was not actionable.

The Ninth Circuit (Circuit Judges Hug, Tang, and Noonan) reversed, holding that although Midler could not state a claim for violation of Section 3344 because her actual voice was not used in the commercial, she could nevertheless state a viable claim for violation of her common law right of publicity. Noting that Ford sought "an attribute of Midler's identity" and that "[i]ts value was what the market would have paid for Midler to have sung the commercial in person" *Midler*, 849 F.2d at 463, the court held as follows:

"We hold only that when a distinctive voice of a professional singer is widely known and is deliberately imitated in order to sell a product, the sellers have appropriated what is not theirs and have committed a tort in California. Midler has made a showing, sufficient to defeat summary judgment, that the defendants here for their own profit in selling their product did appropriate part of her identity." *Id*. at 463-464. At trial, Midler was awarded $400,000 in compensatory damages. The judgment was affirmed on appeal.

***Eastwood v. Superior Court*, 149 Cal.App. 409, 198 Cal.Rptr. 342 (Ct.App. 1983).** This California appellate decision allowed actor Clint Eastwood to state a right of publicity cause of action against The National Enquirer magazine based on a cover story showing Eastwood's photograph above the headline, "Clint Eastwood in Love Triangle with Tanya Tucker." *Eastwood*, 198 Cal.Rptr. at 344-345. Eastwood sued The National Enquirer for false light invasion of privacy and for commercial appropriation of name, photograph and likeness under California common law and Civil Code Section 3344. In its April 13, 1982 edition, the Enquirer published a 600-word article about Eastwood's romantic involvement with two other celebrities,

singer Tanya Tucker and actress Sondra Locke, featuring Eastwood on the magazine's cover

page. Reversing a demurrer sustained without leave to amend, the Court of Appeal held that

Eastwood had stated a viable claim. Without explicit reliance on the Ninth Circuit's decision in

*Midler*, the court implicitly adopted it by broadly articulating the elements of California's

common law right of publicity as follows: "A common law cause of action for appropriation of

name or likeness may be pleaded by alleging (1) the defendant's use of the plaintiff's identity; (2)

the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or

otherwise; (3) the lack of consent; and (4) resulting injury." *Id*. at. 347.

**Cher v. Forum Int'l Ltd., 692 F.2d 634 (9th Cir. 1982), cert. denied, 462 U.S. 1120 (1983).**

Actress/celebrity "Cher" sued a tabloid magazine and freelance writer, Fred Robbins, based on a

published article billed as an "exclusive" interview with Cher. Cher had given Robbins an

interview for a story to be published in Us magazine. At Cher's request, Us declined to publish

the article. Robbins eventually sold the interview to Forum International and Star. Based upon

the headlines, cover page promotions, and related advertising, Cher alleged breach of contract,

unfair competition, misappropriation of name and likeness, misappropriation of her right of

publicity, and violations of the Lanham Act.

The Ninth Circuit held that Forum misappropriated Cher's right of publicity by falsely

indicating that she had revealed facts to Forum that she would not reveal to a rival magazine, and

by falsely indicating that she endorsed the magazine.[2] The Ninth Circuit affirmed an award of

---

[2] In this litigation, the Defendants falsely state that Brown through his company, supplied footage for the film
suggest knowledge of the film's content, consent and approval of the film.

$100,000 in special damages, $69,000 in general damages, and $100,000 in punitive damages. *Cher*, 692 F.2d at 640.

**_Clark v. Celeb Publishing, Inc.,_ 530 F. Supp. 979 (S.D.N.Y. 1981).**

In this action applying California law, the District Court of New York awarded $25,000 in emotional distress damages based on an unauthorized publication of Linda Clark's photographs in Celeb Magazine. Clark, a self-employed professional model and actress, sued Celeb Publishing, Inc. for invasion of privacy and unauthorized use of her photographs that appeared "in a broad range of advertisements, as well as in Forum and Penthouse Magazine . . . ." Noting that Clark resided in California and suffered her alleged injuries in California, District Judge Motley of the United States District Court for the Southern District of New York applied California law, rather than New York law. Judge Motley awarded $25,000 in damages for mental anguish resulting from the unauthorized publication of photographs in what was characterized as a low quality and very explicit pornographic magazine. He also awarded $6,750 in lost compensation, and a $7,000 license fee for the unauthorized use of her photographs.

In this New York case, Judge Motely acknowledged the need for the Defendant to license the image of Clark under the California law, just as the defendants needed the Plaintiffs consent to utilized their images and voices in the film "Can I Be Me".

The California statute contains exceptions related to news, sports and politics in regards to "expressive works". Courts often focus on this statutory safe harbor, instead of the First Amendment directly, when confronting statutory right of publicity claims.  See *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 415-417 (Cal. Ct. App. 2001). Despite the

14

statutory exemption, as the case law above indicated (*Abdul Jabbar, Midler, Clark, Waits, Cher Eastwood*), the exemption does not apply.

Defendants' reliance of *Dora v Frontline Video Inc.*, is unfounded.   As indicated in *Dora*, publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it, is not ordinarily actionable. (*Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 421 [198 Cal. Rptr. 342](1983); Dora, 15 Cal. App. 4th at  542. Unlike this litigation, in *Dora*, almost all of the footage of Dora was taken while he was either surfing or on the beach in the public. One's voluntary action in a public place waives one's right of privacy as " 'there can be no privacy in that which is already public.' "(*Gill v. Hearst Publishing Co.*, 40 Cal. 2d 224, 230, 253 P.2d 441 (1953), quoting *Melvin v. Reid*, 112 Cal. App. 285, 290, 297 P. 91 (1931)).

In this matter, unlike the distinguishable cases cited by the Defendants, the Plaintiffs were not in the public areas for most of the film.  In the footage complained of by the Plaintiffs, (1) the Plaintiffs were in private hotel rooms (2) private dressing rooms, (3) areas not open to the general public during concerts [like backstage preparation areas for artists/performers only] and (4) private home video and (5) footage that appears in "Can I Be Me" which is subject to Contract 1 and no approval was granted to the Defendants by the Plaintiffs to use the footage. Defendants did not have consent to use any of the footage of the Plaintiffs. Therefore, the Defendants intent to utilize the "public affairs" statutory defense to validate its unauthorized use of the footage which was not public and/or contractually unavailable to the Defendants due to Contract 1, is meritless. For this reason, the motion must be denied.

**D. The First Amendment Does Not Warrant Dismissal of Plaintiffs Right to Publicity Claims.**

In a two-part test first articulated by the U.S. Court of Appeals for the Second Circuit in *Rogers v. Grimaldi*, (875 F.2d 994 (2d Cir. 1989), the First Amendment can protect Lanham Act violators from liability as long as certain standards are met. But the *Rogers* test has not been adopted by all courts, especially in regards to claims associated with the rights of publicity. Indeed, recently in *Hart v. Electronic Arts, Inc*., 717 F.3d 141 (3d Cir. 2013), the U.S. Court of Appeals for the Third Circuit rejected the *Rogers* test in favor of the "transformative use" test. The Court in *Hart* found that while the *Rogers* test might be appropriate in the trademark context, it was not appropriate for cases involving rights of publicity.  The 9th Circuit has also rejected the *Rogers* test in dealing with rights of publicity. *Davis v.  Electronic Arts*, No. 12-15737 (9th Cir. Court of Appeals, Decided January 6, 2015)  To quote the 9th Circuit of Appeals:

> We explained that the *Rogers* test "was designed to protect consumers from the risk of consumer confusion – the hallmark element of a Lanham Act claim." *Id*. at 1280. In contrast, the right of publicity "does not primarily seek to prevent consumer confusion." *Id*. "Rather, it primarily 'protects a form of intellectual property [in one's person] that society deems to have some social utility.'" *Id*. (alteration in original) (quoting *Comedy III*, 21 P.3d at 804). Thus, the *Rogers* test does not apply to the plaintiffs' right-of-publicity claims.

*Davis v.  Electronic Arts*, No. 12-15737, page 12 (9th Cir. Court of Appeals, Decided January 6, 2015). Affirmation of Christopher Brown at Exhibit B.

There is an obvious tension between the right of publicity, which allows a person to control the commercial use of their name or likeness, and the First Amendment, which guarantees the right of free expression. Courts have developed various tests to balance these competing interests. The governing test in California, which is being adopted by increasing

16

numbers of courts outside the California state courts, was promulgated by the state Supreme

Court in *Comedy III Prods. v. Gary Saderup Inc.*, 25 Cal. 4th 387 (Cal. 2001).[3] The *Comedy III*

Court held that the critical factor in determining whether a defendant's First Amendment rights

outweigh a plaintiff's right of publicity is whether the accused work is "transformative"—

whether the plaintiff's identity is "one of the 'raw materials' from which an original work is

synthesized, or… the very sum and substance of the work in question." The court found that

prints of a realistic charcoal sketch of the Three Stooges, however masterfully executed, were not

sufficiently transformative to avoid the right of publicity. Such is also the case in this litigation,

as there in no transformative value to Defendants use of the Plaintiffs' intellectual property.

In the years since, the *Comedy* III decision, Courts have sometimes struggled to articulate

a clear standard for how to measure the transformativeness of a work. Recently, the appearance

of virtual characters based on real-world individuals in games has become the basis for several

decisions exploring this problem. One popular genre of video game is sports simulation, which

allows players to assemble teams and pit them against one another—often using real-world

athletes to staff the teams. In *Keller v. Electronic Arts*, 2013 DJDAR 10071 (9th Cir. 2013), a

former NCAA quarterback claimed that Electronic Arts' game "NCAA Football," which

included in its extensive roster a character that allegedly closely resembled the plaintiff, violated

his statutory and common law rights of publicity under California law. Electronic Arts filed an

anti-SLAPP motion. The district court applied the *Comedy III* standard and found that because

the game realistically depicted the plaintiff doing what he was notable for, it did not

meaningfully transform the plaintiff's identity and denied the anti-SLAPP motion. Such is the

---

[3] Same applies under Georgia Right to Publicity law.

17

case in this litigation as the Defendants use of the Plaintiffs intellectual property has no transformative value.

In *Hart*, another former NCAA quarterback brought claims similar to Keller's under New Jersey's common law right of publicity. Rather than looking to the *Comedy III* standard in evaluating Electronic Arts' motion for summary judgment, however, the district court applied the test developed by the 2nd U.S. Circuit Court of Appeals in *Rogers*, which spares a defendant from liability under the right of publicity as long as the defendant's use of the plaintiff's identity is artistically relevant to the overall work, and is not explicitly misleading as the source or content of the work. Applying that test, the court granted summary judgment to Electronic Arts. However, on appeal the 3rd U.S. Circuit Court of Appeals held that *Comedy III* was the appropriate test to apply, and reversed on essentially the same grounds as the decision in *Keller*. Not long after the 3rd Circuit's decision in *Hart*, the 9th U.S. Circuit Court of Appeals ruled on Electronic Arts' appeal in *Keller*, upholding the district court's application of *Comedy III*.

There is a clear pattern of holdings that the use of a person's likeness is unlikely to be protected by the First Amendment. The reasoning in these decisions, are applicable to uses of likenesses in other media as well. Most notably, both of the decisions applying *Comedy III* focused on the extent to which the Plaintiff's likeness in and of itself had been transformed, not the transformative or creative content of the work as a whole. Both Plaintiffs' likenesses were a very small part of the game in which they appeared, but the courts held that the rest of the game was essentially irrelevant. Because the likenesses themselves were intended to be accurate representations, they were not transformative.

Hence, Defendants' film that depicts Robert Brown and BKB…being Robert Brown and BKB, has no transformative value.  The Defendants intended the use of Plaintiffs' intellectual property to be an accurate representation of the Plaintiffs in the film. The First Amendment does not afford  protection for the Defendants unauthorized use of the Plaintiffs persona, image and voices without transformative value.   Furthermore, the Defendants would have no right to use the imagery of the Plaintiffs that is subject of Contract 1. For these reasons, Defendants motion must be denied.

For Showtime and the BBC to argue that its ability to create/market/distribute a film utilizing the Plaintiffs images and voices, in violation of  (1) statutory law  (2) common law and (3) a contract which mandates the Plaintiffs' consent to the use of their images and voices in the film, is meritless. That is not the purpose or intent of the First Amendment. The Plaintiffs clearly intended to commercially exploit the Plaintiffs' images and voices for financial gain.

 It was Showtime and the BBC that went forward with the continued airing of the movie, with full knowledge of Plaintiffs' rights.  If Showtime and the BBC are able to avoid liability associated with the unauthorized use of Plaintiffs intellectual property and the violation of Contract 1, this would create an environment for a tremendous number of films to be made from footage that is not cleared, regardless of the contractual rights of others.  This Court cannot open Pandora's Box on this issue. Hence, the Defendants' motion must be denied.

**E. Defendants Have Violated Georgia's Common Law Right To Publicity In Regards To The Estate Of Bobbi Kristina Brown And The First Amendment Does Not Protect The Defendants' From Liability.**

Georgia recognizes a right of publicity to protect against "the appropriation of another's name and likeness ... without consent and for the financial gain of the appropriator ... whether the person whose name and likeness is used is a private citizen, entertainer, or ... a public figure who is not a public official."  *Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.,* 296 S.E.2d 697, 703 (1982). "The right of publicity may be defined as [an individual's] right to the exclusive use of his or her name and likeness." *Id.* at 700 (citation omitted). Violation of the right of publicity is a state tort. *Id.* at 703. See also *Alonso,* 325 S.E.2d at 153 ("The courts in this state have long recognized that one who makes an unsanctioned appropriation of another's name or likeness for his own benefit may be liable to that person in tort.") . Georgia's right to publicity survives death. See *King*, 296 S.E.2d 697; *Bell v. Foster*, 2013 WL 6229174 (N.D. Ga. 2013); *Toffoloni v. LFP Pub. Grp., LLC,*572 F.3d 1201 (11th Cir. 2009).

Georgia's courts have developed a common law right of publicity. Various Georgia court decisions refer to the "right of publicity," "misappropriation of likeness," and similar terms. See *King*, 296 S.E.2d 697 (1982). 'Georgia's right of publicity protects against unauthorized uses of a person's identity "for financial gain." In *King*, the manufacture and sale of Dr. King's bust, violated the right of publicity which had passed to his heirs upon Dr. King's death. *King*, 296 S.E.2d 697. The *King* defendant's sale of plastic busts was considered commercial.  In *Alonso*, the Georgia Supreme Court further ruled that use of a person's name on "various forms and documents" used in the course of business could establish a violation. 325 S.E. 2d 152.

20

Plaintiff has properly plead the cause of action, however, the Defendants contend their action is protected by the First Amendment. This argument is meritless as indicated in section D above. Defendants' reliance on *Valencia v. Universal City Studios LLC*, NO. 1:14-CV-00528-RWS, 2014 WL 7240526, AT *8 (N.D. GA. DEC. 18, 2014) is equally irrelevant.  In *Valenica*, the dancer Honey Rockwell alleged that the fictional dramatic films "Honey" and "Honey 2" misappropriated her image as its lead character was named Honey Daniels and known to be a dancer like the Plaintiff.  Honey Rockwell was not in the films at question in *Valencia*. The court found no misappropriation.

Defendants' reliance on *Thoroughbred Legends, LLC v. The Walt Disney Co*, NO. 1:07-CV-1275-BBM, 2008 WL 616253, AT *11 (N.D. GA. FEB. 12, 2008) is equally distinguishing, but this case establishes that not all claims are barred by the First Amendment as the Defendants contend. The three plaintiffs in *Thoroughbred*, were the former jockey and trainer of a racehorse called "Ruffian" and a company formed to license the rights associated with the story of "Ruffian". The plaintiffs registered "Ruffian" as a service mark in connection with entertainment services and attempted to license the mark to ESPN, who already was making a film about the horse. When ESPN's version of the Ruffian story aired on television in 2007, the plaintiffs filed suit for trademark infringement, defamation, invasion of privacy and false endorsement. Defendant moved for summary judgment pursuant to the First Amendment and all of the claims were dismissed with the exception of the defamation and false endorsement claim which were not precluded by the First Amendment.

As the First Amendment is not a bar claims relating to rights of publicity when the Defendants' usage are not transformative, the Defendants' motion must be denied.

21

**F. Defendants Have Violated The Lanham Act With Their Unauthorized Use of Plaintiffs Likeness and Voices and Their Actions Are Not Protected By The First Amendment.**

Section 43(a) of the Lanham Act creates liability for "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce . . . false or misleading representation of fact, which is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1). This provision of the Lanham Act "is an appropriate vehicle for the assertion of claims of falsely implying the endorsement of a product or service by a real person." *Albert v. Apex Fitness, Inc.*, No. 97 Civ. 1151 (LAK), 1997 WL 323899, at *1 (S.D.N.Y. Jun. 13, 1997) (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 28:15 (4th ed. 1996)). The elements of a false endorsement claim under the Lanham Act are that the defendant, (1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services. *Warner Bros. Entm't Inc. v. Ideal World Direct*, 516 F. Supp. 2d 261, 268 (S.D.N.Y. 2007); *Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*, No. 04 Civ. 6107 (DAB), 2006 WL 2289847, at *10-11 (S.D.N.Y. Aug. 8, 2006).

The Defendants are utilizing the unregistered marks of Robert Brown and BKB in the marketing, distribution, advertising and production of the movie "Can I Be Me". These actions violate the Lanham Act and constitute false origin and endorsement in addition to unfair competition as the Defendants are utilizing the marks of the Plaintiffs without consent. The Defendants argument that their actions are protected by the First Amendment is without merit.

The Second Circuit's approach from *Rogers,* which "requires courts to construe the Lanham Act `to apply to artistic works *only* where the public interest in avoiding consumer confusion *outweighs* the public interest in free expression.'" *Mattel, Inc. v. Walking Mountain,* 353 F.3d 792, 807 (9th Cir 2003)(emphasis in original) (quoting *Rogers,* 875 F.2d at 999). The specific test contains two prongs. An artistic work's use of a trademark that otherwise would violate the Lanham Act is not actionable "`unless the [use of the mark] has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless [it] explicitly misleads as to the source or the content of the work.'" *Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894, 902 (9th Cir.2002) (quoting *Rogers,* 875 F.2d at 999) (emphasis added).

Due to the fact that the use of  Plaintiffs' marks, images and voices have relevance to the film, Showtime and the BBC must provide evidence that (1) they did not explicitly mislead as to the sources of the film and (2) did not mislead as to the content of the work, in order to assert the affirmative First Amendment Defense.

## 1. Use Of Plaintiffs Marks Are Not Consist With  The Rogers or the Gordon's Analysis of Artistic Relevance In Regards To Source And Content.

Recently  the U.S. Court of Appeals for the Ninth Circuit in *Gordon v. Drape Creative Inc.,* No. 16-56715 (9th Cir. July 30, 2018) ("*Gordon*") found a sufficient issue of fact that must satisfy the *Rogers* test.  In *Gordon*, the trademark holder originated various honey badger catchphrases made popular on the Internet through YouTube videos.  Accordingly, the trademark holder registered the catchphrase "Honey Badger Don't Care" for an assortment of goods that included audio books, greeting cards, mugs, and clothing.  The defendant in *Gordon* marketed a line of greeting cards that used the trademark holder's catchphrase with minor variations.

23

The Ninth Circuit panel held that, under the test in *Rogers*, the Lanham Act applies to expressive works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. In *Gordon*, defendants pasted plaintiff's mark into their greeting cards. The panel held that a jury could determine that this use of plaintiff's mark was explicitly misleading as to the source or content of the cards. Therefore, the panel reversed the district court's grant of summary judgment and remanded for further proceedings.

The Defendants use on Plaintiffs' unregistered marks violates the *Gordon* and *Rogers* analysis in regards to artistic relevance and appropriation of the Plaintiffs goodwill, their names, images, voices  and Brown's company "Brownhouse".  Also, contractually, the Defendants needed Plaintiffs' consent to use the marks pursuant to Contract 1. For these reasons, Defendants' motion must be denied as a jury could rule that Defendants use of Plaintiffs' intellectual property and violation of Contract 1 were misleading as to source or content.

## 2. The Defendants Have Been Misleading As To Content Of The Film

A Defendant has been misleading as to the source if there is a suggestion of endorsement or sponsorship by the Plaintiff. The basic idea is that use of a trademark is sometimes necessary to identify and talk about another party's products and services. *See New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302 (9th Cir. 1992), however, the marks must be used in a manner that does not suggest inaccurate content.  The Defendants cannot assert the First Amendment affirmative defense in this litigation because Showtime and the BBC are misleading the public.

24

With the analysis in *Gordon*, it is clear that the Defendants'' motion must be denied. The Defendants are using behind the scenes footage which contain the Plaintiffs images and voices. The Defendants also credit Brown's company in the film for providing the footage. This is absolutely false. Brown did not and would not approve the usage.  The use of Brown's imagery, voice and crediting his company for the imagery, suggests approval or endorsement of the film. The Rogers court held that "In sum, we hold that section 43(a) of the Lanham Act does not bar a minimally relevant use of a celebrity's name in the title of an artistic work where the title does not explicitly denote authorship, sponsorship, or endorsement by the celebrity or explicitly mislead as to content." *Rogers*, 875 F.2d at 1005.  Showtime and BBC use  the Plaintiffs unregistered marks, imagery, voices and identify Brown's entity Brownhouse in the credits  and violation of Contract 1, suggest/indicates a false endorsement. Hence, the motion must be denied.

**G. Brown Contract with B2 Entertainment LLC Has Been Breached.**

The breach of Contract 1 in and of itself satisfies the elements of  (1) statutory violation of the right to publicity (2) common law right to the publicity and (3) a Lanham Act violation. Pursuant to Contract 1 between B2 and Brownhouse, Brown, Shelley and Simmons agreed not to use any materials associated with Brown's family friends or employers without his consent in tv or film projects.  The parties have an enforceable contract which B2/Shelly/Simmons breached the contract and which Showtime and The BBC continue to support and benefit from the breach. Defendants' movie is partially the product of the breach of Contract 1. The Contract contained a confidentiality provision and other clauses relevant to this litigation.

> 2(b) reads in part:
> Artist grants to Company the right to use, film, tape and
> otherwise record events relating to or occurring in Artist's

25

life and portions of Artist's life story including without
limitation any relationships with family, friends, employers
and the like during and after all phases of production of
the Project, so that Company can produce episodes of the
Project, and so that Company can distribute, exhibit and/or
otherwise use the Project and/or other works, productions
and materials based thereon.

Section 6 reads as follows:
6.      Confidentiality:  Except where required by law,
both parties shall keep confidential the Project and any
ideas, concepts, stories plots, themes or other material
related to the Project unless express written consent is
provided by the parties.  Neither party shall: circumvent
the other's role and anticipated financial compensation
in connection with the Project or other unscripted television
programs; negotiate a side deal with any third party in the
which does not include the other party; or any way
attempt to circumvent the spirit and intent of this Agreement.

The Defendants are clearly using material that is the subject of the contract. B2,

Showtime and BBC unauthorized use of materials that are the subject of the contract is

impermissible.  To argue that the First Amendment supersedes Brown's ability to contractual

protect his image, likeness and voice is meritless and would render contracts meaningless in our

intellectual property and rights to publicity jurisprudence.

Furthermore, Defendants' use of Plaintiffs' marks without authorization,-when Plaintiffs

are not involved in the production, promotion of the film-risks damaging Plaintiffs' reputation.

*See Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836,

845-46 (D. Minn. 2011) (enjoining former franchisee from continued use of franchisor's

trademarks after termination of franchise agreement to prevent damage to brand reputation and

goodwill). The Defendants continuing to use of Plaintiffs' trademarks (Bobby Brown, Bobbi

Kristina and Brownhouse) to distribute, market and produce the movie is a clear violation and

the Plaintiffs' have lost control of images that required their contractual consent.   Brown's rights

26

to privacy/publicity in the footage that is the subject of Contract 1 is also part of Brown's ability to utilize his persona and image. See *Bret Michaels v. Internet Entertainment Group, Inc.,* F. Supp. 2d 823, 1998 U.S. Dist. Lexis 10678 (District Court CA April 28, 1998) (Sex film recording enjoined to protect plaintiff's right to privacy. Plaintiff had spent years developing his personal persona that the film violated his rights, causing irreparable injury).

It is also important to note that the images that were part of the Defendants' film that are the subject of the Contract 1confidentiality clause, also establishes a publicity violation. *See Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) (stating that "the disclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature").

For the reasons, stated above, the Defendants' motion must be denied.

## H. Plaintiffs Have Properly Plead An Interference With Contractual Relations Count.

In order to establish a claim for tortious interference with contractual relations, a plaintiff must prove that: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach *or disruption of the contractual relationship*; (4) *actual breach or disruption of the contractual relationship*; and (5) resulting damage. *See Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990)(emphasis added).

Contract 1 is governed by California law, not New York law as the Defendants contend (See paragraph 7 of Contract 1). Showtime and the BBC argue that the Plaintiffs did not allege any intentional conduct by the Defendants to procure a breach by B2 and it affiliates. This argument is meritless. After learning of Contract 1, Showtime and the BBC continued to air the

27

movie and act as if the rights were secured legally and properly to Plaintiffs' images and voices. Showtime and the BBC had a responsibility to cease their violation of the Plaintiffs' rights and disruption of Contract 1.  Showtime and the BBC continue to represent to the world that is had the rights to utilize the Plaintiffs images and voices despite the clear violation of Contract 1. Showtime and the BBC never sought the consent of the Plaintiffs.  Showtime and BBC knew of the contract and continued to disrupt the contractual relationship.  For this reason, the Motion must be denied.

## I. This Court Has Jurisdiction Over the BBC.

Personal jurisdiction exists if the relevant state's long-arm statute extends to the defendant and exercise of such jurisdiction is consistent with due process. *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). A court may exercise "general jurisdiction" over a nonresident defendant when the defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (citation omitted). A court may exercise "specific jurisdiction" over a nonresident defendant when the litigation results from injuries that arise out of or relate to the defendant's activities in the forum state. *Id*. The defendant's contacts with the forum state must show that it "reasonably anticipates being haled into court" there. *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006). The plaintiff bears the burden of establishing a *prima facie* case of personal jurisdiction. *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 343 (5th Cir. 2002). "[T]he court must accept as true all uncontroverted allegations in the complaint and must resolve any factual disputes in favor of the plaintiff." *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 496 (5th Cir. 2012).

28

The Due Process Clause permits the exercise of personal jurisdiction over a non-resident when (1) the defendant has established minimum contacts with the forum state and (2) the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Kelly v. Syria Shell Petroleum Dev., B.V.*, 213 F.3d 841, 854 (5th Cir. 2000). The minimum contacts requirement can be established through specific or general jurisdiction. *Id.*

General jurisdiction is warranted if "that corporation's 'affiliations with the State are so continuous and systematic as to render [it] *essentially at home* in the forum State.'" "Home" should be defined in relation to the "corporation's activities in their entirety, nationwide and worldwide" and should not rely "on the magnitude of a defendant's in-state activities … [o]therwise, 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States." *Daimler*, 134 S. Ct.at 748, n. 20.

In *Perkins v. Benguet Consolidated Mining Co.* 342 U.S. 437 (1952), the Supreme Court delineated the scope of general jurisdiction and its applicability to corporations. In *Perkins*, the Court held that a court could exercise general personal jurisdiction over a corporation on the basis of that company's "continuous and systematic" contacts with the forum state. The Court further stated that a foreign corporation's temporary relocation of operations to a state can be considered "continuous and systematic" to subject that corporation to proceedings in that state. Accordingly, it was proper to exercise general jurisdiction over a Philippine corporation in Ohio, the state where the company's operations were temporarily managed during World War II.

This Court has general and specific jurisdiction over the BBC. The BBC is extremely active in the United States-New York specifically, and is viewed on Cablevision and other cable networks. https://www.bbc.com/news/world-radio-and-tv-14563857 in the state of New York.

29

To quote the BBC's website link above:

> In the US, BBC World News is available with a range of
> television service providers including **Cablevision** (Optimum TV),
> **Comcast** (XFINITY), **Time Warner Cable**, **Verizon**,
> DirecTV, Charter, AT&T U-verse, Buckeye Cable and others.

On Optimum Cable TV, The BBC is seen on channel 101 and 104 in New York and has

purposely  reach into the New York market.   https://www.multichannel.com/news/cablevision-

launches-bbc-america-tv-one-reelz-io-package-327400

The BBC can be viewed on Verizon Fios on channel 189 and 669 in New York.

https://www.verizon.com/about/news/press-releases/verizon-adds-bbc-america-hd-fios-tv-lineup

The BBC has actively entered the United States and New York and promotes its  US activities on

its website, with the target audience being US residents. There is no doubt that the BBC has

contractual arrangements within New York and the United States to air its content, mandating

jurisdiction over the BBC as it has substantial contacts with the state of New York. The BBC has

also engaged in an intentional tort, mandating supplemental jurisdiction over the BBC in New

York for Plaintiffs' state claims as well.

Courts have personal jurisdiction over a nonresident foreigner who has purposefully

directed his activities at residents of the forum where the litigation results from alleged injuries

that arise out of or relate to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472,

105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal quotation marks omitted); see also *Calder v.

Jones*, 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (In the context of intentional

torts, jurisdiction is proper over defendants whose intentional, and allegedly tortious, actions

were expressly aimed at [the forum state].). [I]t is essential in each case that there be some act by

which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174 (internal quotation marks omitted). Physical presence in the forum state, however, is not required. Id. at 476, 105 S.Ct. 2174. There is not doubt that based on the BBC contacts identified above and below, that the BBC has purposely directed continuous activity at New York and is subject to jurisdiction pursuant to the relevant case law.

## 1. There Is General Jurisdiction Over BBC.

A court may exercise "general jurisdiction" over a nonresident defendant when the defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler*, 134 S. Ct. at 754.

In addition to the contacts identified in Section I above, in the Defendants movie, "Can I Be Me", aired in New York and California and the credits identified the BBC's  involvement in the distribution of the film to the US audience.  The BBC knew that the credit appeared in the film and knew that it was marketing its involvement in the Whitney Houston film to the audience in the United States. The BBC was knowingly promoting its involvement with the movie in the United States. All of Showtime's viewers  in New York were able to see the affiliation and credit promotion in the film for the BBC.

In addition, everyday the BBC is seen in New York and the BBC has numerous contracts that relate to its activities in New York.  The BBC's contacts with New York through (1) its television deals to have its content aired in the United States such as Cablevision, Time Warner Cable and Verizon (2) placing its subsidiaries in New York and (3) promoting its involvement

31

with the film in New York and the United States, mandates jurisdiction over the BBC. Furthermore, by violating Brown's contractual rights in Contract 1 and engaging in the intentional tort of tortious interference with contractual relations, the BBC is subject to jurisdiction.

It is also of note that the BBC has availed itself of the laws of the State of New York and has appeared in litigation in New York and participated due it the BBC's continued contacts with New York.  For example:

1.    *Sokolow v. BBC*, 1:2011mc00547 (EDNY)

2.    *Byrne v. BBC*, No. 00-CIV-3141 (SHS) (SDNY); 132 F.Supp.2d 229 (2001); attached to the Affirmation of Christopher Brown at Exhibit C.

3.    *Gross v. BBC*, 386 F.3d 224 (2nd Cir. 2004); attached to the Affirmation of Christopher Brown at Exhibit D.

In *Gross*, the Second Circuit found that the BBC has a presence in New York, and is unquestionably subject to personal jurisdiction in the Southern District. Hence, jurisdiction over the BBC in New York does not violate due process and this Court has general jurisdiction over the BBC.

## 2. There Is Specific Jurisdiction Over BBC.

A court may exercise "specific jurisdiction" over a nonresident defendant when the litigation results from injuries that arise out of or relate to the defendant's activities in the forum state.

In addition to the Court's analysis in *Gross*, the BBC is continually present in New York and does business with Showtime and various television cable companies.  The BBC has also caused injury to Brown on his state law claims (one being an intentional tort) which has the same or similar operative facts as Plaintiffs' federal claims.

The Second Circuit has found jurisdiction over defendants with far less contacts then the BBC with the forum state.  In *MacDermid, Inc. v. Deiter*, 702 F.3d 725 (2d Cir. 2012), The Second Circuit found jurisdiction over a  foreign employee who allegedly misappropriated trade secrets without ever setting foot in the United States.

In addition, sales of services or products in the forum state supports the exercise of personal jurisdiction.  See *Imation Corp. v. Sanho Corp.*, No. 15-1883 (JRT/JSM), 2016 WL 4179363 at *3 (D.Minn. Aug 5, 2016) (a single  sale of an product supports personal jurisdiction); *Whatru Holdings, LLC v. Bouncing Angels.,* No. 13-2745 (JNE/TNL), 2014 WL 641517 at *3 (D. Minn. Feb 19, 2014)(finding specific personal jurisdiction over non-resident corporation based on single sale of product).

The BBC's contacts with New York through (1) its television deals to have its content aired in the United States such as Cablevision, Time Warner Cable and Verizon (2) placing its subsidiaries in New York and (3) promoting its involvement with the film "Can I Be Me" in New York and California  and (4) its violation of Contract 1, all mandate jurisdiction over the BBC. For the all reasons identified in Section I, this court has specific jurisdiction over the BBC.

**J. The Declaration of Clive Illenden Must Be Stricken.**

The Declaration of Clive Illenden must be rejected as it is not notarized and therefore is defective under New York Law. N.Y. Gen. Constr. Law section 12 (McKinney); see also N.Y. C.P.L.R section 2309.  Be that as is may, Mr. Illenden indicates that the BBC operates in New York through its subsidiaries, that are located in New York (see paragraphs 7 and 8 of Declaration) further indicating the BBC contacts with New York mandating jurisdiction.

## IV. CONCLUSION

For the reasons, stated above, the Defendants Motion to Dismiss must be denied.


ROBERT BROWN and
THE ESTATE OF BOBBI KRISTINA BROWN


_____
Christopher L. Brown
CB 3465
Brown & Rosen LLC
Attorneys At Law
100 State Street, Suite 900
Boston, MA 02109
617-728-9111 (T)
May 2, 2019                     cbrown@brownrosen.com

34