UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

---

ROBERT BROWN and THE ESTATE OF
BOBBI KRISTINA BROWN

        Plaintiffs,

v.

SHOWTIME NETWORKS, INC., BRITISH
BROADCASTING CORPORATION, PASSION
PICTURES CORP., TRACEY BAKER-
SIMMONS, WANDA SHELLEY, B2
ENTERTAINMENT, LLC, and SIMMONS
SHELLEY ENTERTAINMENT, LLC

        Defendants.

---

Case No.: 1:18-cv- 011078-CM

ECF Case

Oral Argument Requested

# REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION OF SHOWTIME NETWORKS INC. AND BRITISH BROADCASTING CORPORATION TO DISMISS THE COMPLAINT AND MOTION OF BRITISH BROADCASTING CORPORATION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Samuel M. Bayard
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230
Fax: (212) 489-8340
E-mail: samuelbayard@dwt.com

*Attorneys for Defendants Showtime Networks Inc. and British Broadcasting Corporation*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

I.   Mr. Brown's Right-Of-Publicity Claims Should Be Dismissed ....................................... 2

     A.   The First Amendment Bars Mr. Brown's Claims ..................................... 2

     B.   Mr. Brown's Claims Independently Fail Under California Civil Code
          § 3344(d) ................................................................................................... 4

II.  The First Amendment Bars the Estate's Right-of-Publicity Claim under Georgia Law .... 5

III. Mr. Brown's Lanham Act Claim Must be Dismissed ........................................................ 6

IV.  The Tortious Interference with Contract Claim Fails ....................................................... 7

V.   BBC is Not Subject to Personal Jurisdiction ..................................................................... 9

     A.   There Is No General Jurisdiction Over BBC ............................................ 9

     B.   There Is No Specific Jurisdiction Over BBC ............................................ 9

4811-5028-2646v.5 0106763-000004

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul-Jabbar v. Gen. Motors Corp.*,
　85 F.3d 407 (9th Cir. 1996) .................................................................................................... 4

*Caiz v. Roberts*,
　No. CV 15-9044-RSWL-AGRX, 2019 WL 1755421 (C.D. Cal. Apr. 17,
　2019) ........................................................................................................................................ 6

*Cher v. Forum Int'l, Ltd.*,
　692 F.2d 634 (9th Cir. 1982) .................................................................................................... 4

*Clark v. Celeb Pub., Inc.*,
　530 F. Supp. 979 (S.D.N.Y. 1981) ............................................................................................ 4

*Daimler AG v. Bauman*,
　571 U.S. 117 (2014) .................................................................................................................. 9

*Davis v. Nadrich*,
　174 Cal. App. 4th 1, 94 Cal. Rptr. 3d 414 (Cal. Ct. App. 2009) .............................................. 8

*de Havilland v. FX Networks, LLC*,
　21 Cal. App. 5th 845, 230 Cal. Rptr. 3d 625 (Cal. Ct. App. 2018) ................................. 1, 3, 4

*DeLorenzo v. Viceroy Hotel Grp., LLC*,
　757 F. App'x 6 (2d Cir. 2018) .................................................................................................. 9

*Dora v. Frontline Video, Inc.*,
　15 Cal. App. 4th 536, 18 Cal. Rptr. 2d 790 (Cal. Ct. App. 1993) ....................................... 4, 5

*Eastwood v. Superior Court*,
　149 Cal. App. 3d 409, 198 Cal. Rptr. 342 (Cal. Ct. App. 1983) .............................................. 4

*Gordon v. Drape Creative, Inc.*,
　909 F.3d 257 (9th Cir. 2018) ................................................................................................ 2, 6

*Guzelgurgenli v. Prime Time Specials Inc.*,
　883 F. Supp. 2d 340 (E.D.N.Y. 2012) ...................................................................................... 8

*Huggins v. Povitch*,
　No. 131164/94, 1996 WL 515498 (Sup. Ct. N.Y. Cty. Apr. 19, 1996) .................................... 8

4811-5028-2646v.5 0106763-000004

*Louis Vuitton Malletier S.A. v. Warner Bros. Entm't*,
 868 F. Supp. 2d 172 (S.D.N.Y. 2012) ................................................................................... 7

*Midler v. Ford Motor Co.*,
 849 F.2d 460 (9th Cir. 1988) ................................................................................................. 4

*Montana v. San Jose Mercury News*,
 34 Cal. App. 4th 790, 40 Cal. Rptr. 2d 639 (Cal. Ct. App. 1995) .......................................... 4

*Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*,
 946 F. Supp. 2d 957 (N.D. Cal. 2013) ................................................................................... 8

*Rogers v. Grimaldi*,
 875 F.2d 994 (2d Cir. 1989) ............................................................................................. 3, 7

*RSM Prod. Corp. v. Fridman*,
 643 F. Supp. 2d 382 (S.D.N.Y. 2009) ................................................................................... 8

*Somerson v. World Wrestling Entm't, Inc.*,
 956 F. Supp. 2d 1360 (N.D. Ga. 2013) ................................................................................. 5

*Sullivan v. Barclays PLC*,
 No. 13-CV-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) .................................. 9

*Thoroughbred Legends, LLC v. The Walt Disney Co.*,
 No. 1:07-CV-1275-BBM, 2008 WL 616253 (N.D. Ga. Feb. 12, 2008) ................................ 5

*Valencia v. Universal City Studios LLC*,
 No. 1:14-CV-00528-RWS, 2014 WL 7240526 (N.D. Ga. Dec. 18, 2014) ............................ 5

*Waits v. Frito-Lay, Inc.*,
 978 F.2d 1093 (9th Cir. 1992) ............................................................................................... 4

**Statutes**

28 U.S.C. § 1746 ............................................................................................................................ 8

N.Y. C.P.L.R. § 2106(b) ................................................................................................................ 8

Defendants Showtime Networks Inc. ("Showtime") and British Broadcasting Corporation ("BBC") (collectively, the "Documentary Defendants") respectfully submit this reply memorandum of law in further support of their Motion to Dismiss the Complaint under Rule 12(b)(6) and BBC's Motion to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2).

## PRELIMINARY STATEMENT

Although it runs over thirty pages long,[1] Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opposition") fails to address the major flaws in their claims arising from the documentary *Whitney. "Can I Be Me"* (the "Documentary"), and it does nothing to alter the conclusion that the Complaint against Showtime and BBC should be dismissed.

*First*, Plaintiffs have provided no reason to depart from the well-established case law under the First Amendment that forecloses Plaintiffs' right-of-publicity claims.  Indeed, permitting these claims to proceed would give Plaintiffs and other subjects of newsworthy stories an unprecedented right to censor public discussion of important events and cultural figures.  Thankfully, that right does not exist under law.  The First Amendment gives documentarians, news organizations, and storytellers the right to report, comment on, and depict real people and events without seeking permission.  As the California Court of Appeal recently explained, the creators of "*The People v. O.J. Simpson: American Crime Story* can portray trial judge Lance Ito without acquiring his rights.  *Fruitvale Station*'s writer and director Ryan Coogler can portray Bay Area Rapid Transit Officer Johannes Mehserle without acquiring his rights.  HBO can portray Sarah Palin in *Game Change* without acquiring her rights." *de Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 861, 230 Cal. Rptr. 3d 625, 639 (Cal. Ct. App. 2018).

---

[1] Plaintiffs' Opposition flagrantly violates this Court's Individual Rule IV.E., which limits opposition briefs to twenty-five pages.  Therefore, the Documentary Defendants respectfully submit that the Court should disregard the last nine pages of the brief.

2

*Second*, Mr. Brown cannot save his Lanham Act claim. While he does not dispute that his name and image are artistically relevant to the Documentary, he claims that the use is misleading by relying on *Gordon v. Drape Creative, Inc.*, 909 F.3d 257 (9th Cir. 2018). But the reasoning of *Gordon* is entirely inapplicable here, where the Documentary makes no express or implied claim that Mr. Brown authorized the film, and the credits simply note the source of archival footage used in it.

*Third*, the Opposition confirms that Mr. Brown cannot state a claim for tortious interference with contract because he concedes that he did not even alert the Documentary Defendants to the existence of the contract in question until after the Documentary was complete and distribution was underway. Under these circumstances, any breach had already taken place, and the Documentary Defendants could not plausibly have had the necessary intent to induce a breach or disrupt Mr. Brown's contractual relationship.

Finally, Plaintiffs' Opposition makes a host of conclusory and unsupported allegations regarding BBC's activities in New York, but offers nothing to suggest that exercising personal jurisdiction over BBC is warranted. BBC is not "at home" in New York for purposes of general jurisdiction, and Plaintiffs identify no meaningful contacts with New York related to this dispute for purposes of specific jurisdiction.

## ARGUMENT

### I.  MR. BROWN'S RIGHT-OF-PUBLICITY CLAIMS SHOULD BE DISMISSED

#### A.  The First Amendment Bars Mr. Brown's Claims

In their opening brief, the Documentary Defendants cited a long line of cases applying California law, including a recent California Court of Appeal decision, recognizing that the First Amendment defeats right-of-publicity claims arising from the use of real-life individuals' names,

4811-5028-2646v.5 0106763-000004

likenesses, and life stories in motion pictures, television programs, biographies, and documentaries.  *See* Mem. at 6.

Mr. Brown does not respond in any way to these authorities.  Rather, he cites to a number of cases involving commercial advertising (Opp. at 10-12), and then cites two right-of-publicity cases involving video games, in which courts rejected defenses based on the "transformative-use" test and *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989).  *See* Opp. 16-19.  Those cases are irrelevant here because the Documentary Defendants did not raise either the transformative-use test or *Rogers v. Grimaldi* as a defense to the right-of-publicity claims asserted.

Nor is the transformative-use defense the only – or even the most relevant – defense under the First Amendment, as Mr. Brown seems to suggest.  *See* Opp. at 19.  As the court in *de Havilland*, 21 Cal. App. 5th at 863, 230 Cal. Rptr. 3d at 641, made clear, the "'transformative' test makes sense when applied to products and merchandise—'tangible personal property,'" which is not at issue here.  Instead, here, because there is no dispute that the Documentary is a constitutionally expressive work, it "'is speech that is fully protected by the First Amendment, which safeguards the storytellers and artists who take the raw materials of life—including the stories of real individuals, ordinary or extraordinary—and transform them into art, be it articles, books, movies, or plays.'"  *Id.* at 860, 230 Cal. Rptr. at 638 (quoting *Sarver v. Chartier*, 813 F.3d 891, 905 (9th Cir. 2016)).  Moreover, applying the transformative-use test to a documentary film – much like applying it to news programming or biographies – would make no sense and would be constitutionally anathema, because the point of these genres is to report and comment on real-life people and events, not to distort or "transform" their subjects.[2]

---

[2] Even under the transformative-use defense, Mr. Brown's claims would be barred because the "marketability and economic value" of the Documentary does not "derive primarily from [Mr. Brown's]

3

The other cases cited by Mr. Brown are likewise inapposite. *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407 (9th Cir. 1996), *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992), and *Midler v. Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988) all involve advertisements, not expressive works like the Documentary. In *Eastwood v. Superior Court,* 149 Cal. App. 3d 409, 198 Cal. Rptr. 342 (Cal. Ct. App. 1983), and *Cher v. Forum Int'l, Ltd.,* 692 F.2d 634 (9th Cir. 1982), the publications were false, which is not the case here, and neither case applied the "public affairs" exception. Finally, *Clark v. Celeb Pub., Inc.*, 530 F. Supp. 979 (S.D.N.Y. 1981), is irrelevant because it was a default judgment case in which the only remaining issue was the amount of damages.

### B. Mr. Brown's Claims Independently Fail Under Civil Code § 3344(d)

Mr. Brown's right-of-publicity claims fail as a matter of law for another reason. The right-of-publicity "public affairs" exception under California law applies to works that relate to "topics that might be covered on public television or public radio" and relate to "popular culture" and "real-life occurrences." *See Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 545-46, 18 Cal. Rptr. 2d 790, 794-95 (Cal. Ct. App. 1993). The Documentary falls squarely within this exception – it is about Whitney Houston, who is one of the most significant figures of pop culture in the last few decades, her marriage to the self-described "legendary singer" Mr. Brown, and her tragic and untimely death. *See also Montana v. San Jose Mercury News*, 34 Cal. App. 4th 790, 796, 40 Cal. Rptr. 2d 639, 642 (Cal. Ct. App. 1995) ("public affairs" exception applied "with equal force to professional football," defeating Joe Montana's right-of-publicity claim).

Mr. Brown argues that the exception should not apply because footage of him was filmed in private locations (Opp. at 15), but the law does not recognize any such distinction. In fact,

---

fame" but rather "comes principally from ... the creativity, skill, and reputation" of the creators, director, and producers of the Documentary. *de Havilland*, 21 Cal. App. 5th at 863-64, 230 Cal. Rptr. 3d at 641.

4

*Dora* rejected this argument. There, the court made clear that it did not have to apply a three-part test that considered the intrusion into "ostensibly private affairs" because that test did not relate "to a cause of action for appropriation of name and likeness, but to one for the public disclosure of private facts," which *Dora* had not alleged. 15 Cal. App. 4th at 543, 18 Cal. Rptr. 2d at 793.[3] Similarly, here, the Court need not consider whether the footage was filmed in a public or private place because Mr. Brown has not brought a public disclosure of private facts claim.

## II. THE FIRST AMENDMENT BARS THE ESTATE'S RIGHT-OF-PUBLICITY CLAIM UNDER GEORGIA LAW

The Estate does not meaningfully dispute that the First Amendment protects expressive works against right-of-publicity claims under Georgia law. Nor can it. *See Thoroughbred Legends, LLC v. The Walt Disney Co.*, No. 1:07-CV-1275-BBM, 2008 WL 616253, at *11 (N.D. Ga. Feb. 12, 2008); *Somerson v. World Wrestling Entm't, Inc.*, 956 F. Supp. 2d 1360, 1368 (N.D. Ga. 2013).

The Estate attempts to distinguish *Thoroughbred Legend,* by pointing out that the court did not dismiss the defamation or common-law false-endorsement claims, but that is irrelevant because the Estate has not brought either of those claims.[4] Further, the Estate makes no effort to distinguish *Somerson*, which held that the First Amendment barred the plaintiff's right-of-publicity claim arising from the dissemination of a protected work. 956 F. Supp. 2d at 1366.[5]

---

[3] In dicta, the court in *Dora* went on to apply the test and found that it did not change the ruling, but only after it made clear that it was not relevant. *Id.* at 543-44, 18 Cal. Rptr. 2d at 792-93.

[4] The Estate also attempts to distinguish *Valencia v. Universal City Studios LLC*, No. 1:14-CV-00528-RWS, 2014 WL 7240526, at *8 (N.D. Ga. Dec. 18, 2014), but the Documentary Defendants cited *Valencia* for the proposition that films are "are works protected by the First Amendment," which the Estate does not and cannot dispute.

[5] As explained in the motion, the cases cited by the Estate are inapposite because they relate to commercial products. *See* Mem. at 12.

5

Finally, the Estate's attempt to incorporate the transformative-use test into Georgia law also fails. *See* Opp. at 17 n.3, 12.  The Estate cites no authority in support of its argument that Georgia has adopted the transformative-use test and, more importantly, the Documentary Defendants have not raised transformative use as a defense, and its application to a documentary on a topic of legitimate public concern would be inconsistent with the First Amendment.

## III.   MR. BROWN'S LANHAM ACT CLAIM MUST BE DISMISSED

In his opposition, Mr. Brown does not dispute that the use of his name and likeness is artistically relevant under the *Rogers* test, nor does he attempt to rebut or discredit (or mention at all) the other cases relied on by the Documentary Defendants.  Mr. Brown, instead, relies on *Gordon*, 909 F.3d 257, which does not apply here.

In *Gordon*, owner of the trademarked phrases "Honey Badger Don't Care" and "Honey Badger Don't Give a S - - -" sued a greeting-card maker for selling greeting cards emblazoned with these phrases without any other text.  *Id*. at 260.  The court distinguished the case from previous Ninth Circuit decisions holding that the use of a mark alone cannot satisfy the "explicitly misleading" prong of *Rogers*.  *Id.* at 271.  The court reasoned that, unlike those cases, the phrases were the sum and substance of the greeting cards, and under those circumstances, consumers might mistakenly believe that the plaintiff was the source of the product.  *Id*.

Mr. Brown does not – and cannot – allege anything remotely similar here.  The Documentary uses Mr. Brown's name and image in the context of a biographical narrative of Ms. Houston's life story that is at times critical of Mr. Brown's actions.  Plainly, Mr. Brown's name and likeness do not constitute the very sum and substance of the work, but rather are just one of the many building blocks that make up the film.  *See Caiz v. Roberts*, No. CV 15-9044-RSWL-AGRX, 2019 WL 1755421, at *6 (C.D. Cal. Apr. 17, 2019) (distinguishing *Gordon* because "even where the mark is used, it is through [defendant's] own artistic expression.")  The

Documentary's credits identify the joint venture "B2 Brownhouse Entertainment in Association with Simmons Shelly Entertainment LLC" as the source of archival footage, not Mr. Brown or his company. Bayard Decl., Ex. A, at 1:43:48-1:44:21. Further, unlike the mark in *Gordon*, the word "Brownhouse" does not appear on its own; it is listed with dozens of others sources of archival footage. And, in any event, no reasonable viewer could plausibly conclude from this isolated reference to the joint venture as a source of archival footage that Mr. Brown or Brownhouse produced, authorized, or endorsed the Documentary. *See Louis Vuitton Malletier S.A. v. Warner Bros. Entm't*, 868 F. Supp. 2d 172, 179 (S.D.N.Y. 2012) (noting that the question under prong two is "whether the defendant's use of the mark is misleading in the sense that it induces members of the public to believe the work was prepared or otherwise authorized by the plaintiff"). Finally, Mr. Brown does not – and cannot – allege that the Documentary made any explicit statement or overt claim that he was affiliated with the project. *See Rogers*, 875 F.2d at 999 (giving as examples of "explicit" misrepresentations, the phrases "an authorized biography" or "Jane Fonda's Workout").

## IV.   THE TORTIOUS INTERFERENCE WITH CONTRACT CLAIM FAILS[6]

Mr. Brown argues that California law applies to his tortious interference claim because his contract with B2 Entertainment states that California law governs it. Opp. at 24. But the Documentary Defendants are not parties to that contract, so the choice-of-law provision does not bind them. The Court, however, need not embark on complex choice-of-law analysis because Mr. Brown's claim fails under either New York or California law. Both state laws require an "intentional" act by the defendant to induce a breach or (in the case of California) to disrupt a

---

[6] Plaintiffs argue at length that the contract with B2 Entertainment has been breached. Opp. at 25-26. While the Documentary Defendants dispute that contention and reserve the right to raise the absence of a breach in later motions should the case proceed, the Documentary Defendants do not raise that argument on this motion, and thus Plaintiffs' discussion is irrelevant.

7

contractual relationship, which Mr. Brown has not and cannot allege. *See RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 405 (S.D.N.Y. 2009); *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 980 (N.D. Cal. 2013).

In fact, Mr. Brown confirms in his Opposition that the Documentary Defendants did not learn of the contract until after the Documentary was complete and already being distributed. Mr. Brown claims that the Documentary Defendants "continued to air" the Documentary and did not "cease" distribution after learning of the contract. *See* Opp. at 27 -28. These allegations doom Mr. Brown's claim. Because the alleged breach took place (if at all) when the material was licensed without Mr. Brown's consent, which was *before* the Documentary Defendants learned about the contract, the Documentary Defendants could not plausibly have *intended* to procure a breach by B2 or otherwise disrupt the relationship when the critical event took place. *See Davis v. Nadrich*, 174 Cal. App. 4th 1, 10-11, 94 Cal. Rptr. 3d 414, 422 (Cal. Ct. App. 2009) ("[Plaintiff] has not brought forth any facts to show that [the defendant] was sufficiently aware of the details of the [contract] to form an intent to harm it.").

Moreover, the only plausible intent for the Documentary Defendants to continue distributing the film after notification from Mr. Brown was to further their First Amendment rights to convey speech on a matter of public concern, *not* to intentionally procure a breach of contract or harm Mr. Brown's relationship with B2. *See Huggins v. Povitch*, No. 131164/94, 1996 WL 515498, at *9 (Sup. Ct. N.Y. Cty. Apr. 19, 1996).

## V. BBC IS NOT SUBJECT TO PERSONAL JURISDICTION[7]

### A. There Is No General Jurisdiction Over BBC

BBC is not subject to general jurisdiction because it is not incorporated in New York, does not have its principal place of business in New York, and is not "at home" in New York. In their Opposition, Plaintiffs do not dispute these dispositive facts. Instead, Plaintiffs raise a host of arguments, saying that BBC is subject to general jurisdiction because BBC-branded television channels air in New York,[8] its website is accessible here,[9] and because it has "numerous contracts" that relate to New York. Opp. at 31-32. Plaintiffs provide no actual evidence for any of these claims, and, even if true, they simply posit that BBC should be subject to general jurisdiction in New York because it or its subsidiaries do business here. But the U.S. Supreme Court explicitly rejected the "doing business" rationale in *Daimler AG v. Bauman,* 571 U.S. 117, 137 nn. 18 & 20 (2014) (noting that "doing business" has long been abandoned as the test for general jurisdiction). The cases cited by Plaintiffs are inapposite because they all were decided before the U.S. Supreme Court's decision in *Daimler*, and their conclusory arguments come nowhere close to establishing general jurisdiction.

### B. There Is No Specific Jurisdiction Over BBC

Plaintiffs argue that specific jurisdiction exists based on "television deals" and the

---

[7] Plaintiffs' argument that the Declaration of Clive Illenden should be stricken lacks merit. The Documentary Defendants complied with 28 U.S.C. § 1746, which permits unsworn declarations in federal court. *See Guzelgurgenli v. Prime Time Specials Inc.*, 883 F. Supp. 2d 340, 352 (E.D.N.Y. 2012). Furthermore, New York law no longer requires notarization for affirmations of foreign declarants, so long as the affirmation contains a statement that it is made under penalty of perjury. C.P.L.R. § 2106(b).

[8] Plaintiffs mention BBC America, a channel that is owned in part by BBC's subsidiary BBC Studios, and BBC World News, a channel that is owned and an operated by BBC Global News Ltd, a BBC subsidiary. *See* Suppl. Decl. of Illenden ¶¶ 2-3. "The mere existence of an in-state branch or subsidiary is insufficient to confer general personal jurisdiction over a foreign parent." *Sullivan v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *41 (S.D.N.Y. Feb. 21, 2017).

[9] *See DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6, 9 (2d Cir. 2018) ("The accessibility of the [the defendant's] website from New York does not, without more, establish continuous solicitation sufficient to confer general jurisdiction.")

9

location of subsidiaries (Opp. at 32-34), but these purported contacts are unrelated to the Documentary and therefore cannot be the basis for specific jurisdiction. *Goodyear Dunlap Tire Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (specific jurisdiction requires "an affiliation between the forum and the underlying controversy, principally [an] activity or occurrence that takes place in the forum State.")

The remaining argument that BBC "promot[ed] its involvement" in the Documentary also fails. Plaintiffs identify no specific actions taken by BBC in New York to "promote its involvement" in the Documentary, and they do not dispute that BBC only distributed the film in the United Kingdom. They appear to rely on the fact that the Documentary's opening credits include a BBC logo card. Opp. at 31. But Plaintiffs make no allegation in the Complaint – and provide no evidence in opposition – suggesting that BBC specifically directed these opening credits to New York viewers, as opposed to viewers everywhere else in the world. Not surprisingly, Plaintiffs cite no authority in which a court has ever exercised specific jurisdiction based on the appearance of a company's logo in the opening credits of a film. Instead, they rely on plainly distinguishable cases, where the defendants purposefully directed activities to the forum state by misappropriating trade secrets from a party in the state or by directly selling an infringing product in the state. *See* Opp. at 33.[10]

## CONCLUSION

For the foregoing reasons, the Documentary Defendants respectfully submit that the Court should dismiss the Complaint against them in its entirety. Alternatively, BBC respectfully submits that the Court should dismiss the Complaint against it for lack of personal jurisdiction.

---

[10] Plaintiffs also argue that specific jurisdiction is proper because of the BBC's "violation of Contract 1", but the BBC was not a party to the contract and could not have breached it. *See* Compl., Ex. G.

10

| | |
|---|---|
| Dated: New York, New York<br>May 14, 2019 | Respectfully submitted,<br><br>DAVIS WRIGHT TREMAINE LLP<br><br>By: /s/ Samuel M. Bayard<br>      Samuel M. Bayard<br><br>1251 Avenue of the Americas, 21st Floor<br>New York, New York  10020<br>Telephone: (212) 489-8230<br>Fax: (212) 489-8340<br>E-mail: samuelbayard@dwt.com<br><br>*Attorneys for Defendants Showtime Networks Inc. and British Broadcasting Corporation* |

4811-5028-2646v.5 0106763-000004