**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ROBERT BROWN and THE ESTATE OF BOBBI
KRISTINA BROWN,

      Plaintiffs,

      -against-

SHOWTIME NETWORKS, INC., BRITISH
BROADCASTING CORPORATION, PASSION
PICTURES CORP., TRACEY BAKER-SIMMONS,
WANDA SHELLEY, B2 ENTERTAINMENT, LLC,
and SIMMONS SHELLEY ENERTAINMENT, LLC

      Defendants.

No. 18 Civ. 11078 (CM) (JLC)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/2/19

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

McMahon, C.J.:

Plaintiffs Robert "Bobby" Brown ("Brown") and the Estate of Bobbi Kristina Brown ("the Estate") bring this action against Showtime Networks, Inc. ("Showtime") and British Broadcasting Corporation ("BBC"). Plaintiffs also named as Defendants Passion Pictures Corp., Tracey Baker-Simmons, Wanda Shelley, B2 Entertainment, LLC ("B2"), and Simmons Shelley Entertainment, LLC. The gravamen of Plaintiffs' Complaint (hereinafter referred to as the "Complaint") is that Showtime and BBC used allegedly unauthorized footage of the Browns in a documentary film on the life of Whitney Houston, titled *Whitney: Can I Be Me.* (Compl. dated Nov. 28, 2018, Dkt. No. 1.) Plaintiffs allege violations of 43(a) of the Lanham Act, as well as state law claims of right of publicity violations and tortious interference with contractual relations.

BBC now moves to dismiss the Complaint for lack of personal jurisdiction, and Defendants move to dismiss certain counts for failure to state a claim.

For the reasons set forth below, BBC's motion to dismiss is granted. Defendants motion to dismiss is granted in part and denied in part. However, because the only federal claim in the Complaint is dismissed, the Court declines to exercise supplemental jurisdiction over the counts that remain.

## I.    Factual Background

### A.    The Parties

Plaintiff Bobby Brown is a "legendary singer" and "international superstar" who has sold millions of albums. (Compl. ¶¶ 12, 55.) He is best known for his work in the musical group New Edition and solo singing career. (*Id.* ¶ 12.) Brown is also well-known as the ex-husband of the late singer Whitney Houston. (*Id.* ¶¶ 12–13.) He is a California resident. (*Id.* ¶ 3.)

Brown and Houston had a daughter together, Bobbi Kristina Brown, who died in Georgia in 2015. (*Id.* ¶¶ 12, 24.) Brown asserts that information about him, Houston, and Bobbi Kristina is "very valuable and of interest to the public." (*Id.* ¶ 20.)

Defendant Showtime is a television network headquartered in New York. (*Id.* ¶ 5.) Defendant BBC is a television network headquartered in the United Kingdom. (*Id.* ¶ 6.) Passion Pictures Corp. is a film production company headquartered in New York. (*Id.* ¶ 7.) Tracey Baker-Simmons and Wanda Shelley are film and television producers and Georgia residents, and were the executive producers of the reality television program *Being Bobby Brown.* (*Id.* ¶¶ 8–9, Ex. G, Agreement § 5(a).) B2 is a now-dissolved film and television production company located in Georgia, and was owned by Baker-Simmons and Shelley. (Compl. ¶ 10.) Simmons Shelley Entertainment, LLC is a film and television production company located in Georgia that is owned by Baker-Simmons and Shelley. (*Id.* ¶ 11.)

2

## B. *Being Bobby Brown* **Reality Television Program**

In 2004, Brown, through his now dissolved production company, Brown House Entertainment, Inc. ("Brownhouse"), entered into an agreement ("the Agreement") with B2 to create a reality television program. (*Id.* ¶¶ 60–63; Ex. G.) The program, *Being Bobby Brown*, starred Brown and aired on Bravo for one season in 2005. (Compl. ¶¶ 31, 63.)

The Agreement authorized the filming, taping and recording of Brown's life and portions of his "life story," including his relationships with family and friends, for the television program. (Ex. G, § 2(b)(i).) The Agreement also included a "confidentiality" clause: "Both parties shall keep confidential the Project [the reality television program] and any ideas, concepts, stories plots [*sic*], themes or other material related to the Project unless express written consent is provided by the parties." (*Id.* § 6.)

## C. *Whitney: Can I Be Me* **Dispute**

In 2016, Showtime and BBC sought to make a documentary charting the life and influence of the late singer Whitney Houston. (Compl. ¶ 29, Ex. C.) On June 1, 2016, film director and producer Nick Broomfield contacted Brown's attorney by email to request an interview with Brown for the film. (*Id.*) Brown declined the interview request. (Compl. ¶ 29.)

Showtime and BBC released *Whitney: Can I Be Me* ("the film") in 2017. (*Id.* ¶ 13.) Showtime distributed the film to air in the United States in August 2017. (*Id.* ¶¶ 13, 17.) BBC aired the film in the United Kingdom. (*Id.* ¶ 18, Ex. A.) The film was also licensed by production companies to air in Germany, Italy, and the Netherlands. (Compl. ¶ 20.)

The film documents the life and career of Houston, noting her purported family problems and drug addiction, and highlights her legacy as a trailblazer for female African-American singers. (Ex. D.) It includes never-before-seen concert footage of Houston's 1999 world tour, public

3

interview excerpts of Houston, and interviews with people in her "inner circle," such as her family, legal advisor, backing vocalists, and close friends. (*Id.*)

The film, which lasts one hour and forty-four minutes, contains approximately thirty minutes of footage depicting Brown and his late daughter Bobbi Kristina, all of which was derived from *Being Bobby Brown*.[1] (Compl. ¶¶ 14–15, 33.)

Brown and the Estate take issue with the film on two grounds.

*First*, Brown and the Estate allege that Showtime and BBC used their names, likenesses and personas without their consent in (*i*) the film; (*ii*) the credits of the film; and (*iii*) the marketing and promotion of the film. (*Id.* ¶¶ 19, 28–30.)

Brown and the Estate never signed releases for their images to be used in the film, and claim Defendants do not have "proper title" to use their footage from *Being Bobby Brown*. (*Id.* ¶¶ 15–16.) Brown alleges the film contains unauthorized footage of musical performances of himself and Bobbi Kristina. (*Id.* ¶ 22.)

The film's end credits list "B2 Brownhouse Entertainment in Association with Simmons Shelley Entertainment LLC" as an archive source. (*Id.* ¶ 19; Ex. B.) Brown claims that this credit suggests that he consented and authorized the use of his image and voice in the film, "which is inaccurate and false." (Compl. ¶ 56.)

Brown claims Defendants used his name, persona and likeness in the marketing and promotion of the film. (*Id.* ¶ 30.) Defendants provided "screeners" of the film to members of the press, giving the press the opportunity to view the film and write reviews in advance of the release date. (*Id.*) Brown alleges that this was part of the intentional "marketing strategy" of the

---

[1]     Plaintiffs do not identify which particular scenes or timestamps from *Whitney: Can I Be Me* are derived from *Being Bobby Brown.* Despite this failing, the Court will presume and accept as true that the film did contain thirty minutes of footage of Bobby Brown and Bobbi Kristina Brown, and that this footage is derived from *Being Bobby Brown.*

defendants—Defendants provided the screeners to the press, knowing that the reviews would mention Brown, and, thus, would draw more attention to the film by discussing Brown. (*Id.*) Brown and the Estate provided several film reviews attached as exhibits, and each review briefly mentions Brown. (*See* Exs. D, E, F.) Because Defendants utilized Brown's likeness in the marketing and promotion of the film, Brown claims, it caused confusion as to the origin, sponsorship, and approval of the film, and as such, has damaged him. (Compl. ¶¶ 55–57.)

*Second*, Brown alleges that Baker-Simmons, Shelley, B2 and Simmons Shelley Entertainment breached the Agreement by providing Defendants footage from *Being Bobby Brown* to use in the film, and Defendants tortuously interfered with the Agreement. (*Id.* ¶¶ 33–34, 72– 79, Ex. G.) Brown informed Showtime and BBC in 2017 that they could not use the *Being Bobby Brown* footage, but Defendants continued to exhibit, distribute, and broadcast the film with the knowledge that the use of Brown's image and likeness was not authorized. (*Id.* ¶¶ 36, 79.[2])

## D.     Present Proceedings

Brown and the Estate filed this action on November 28, 2018, asserting the following causes of action: Brown's right of publicity under California Civil Code § 3344 against all Defendants (Count 1); Brown's right of publicity under California common law against all Defendants (Count 2); the Estate's right of publicity under Georgia common law against all Defendants (Count 3); Brown's claim under § 43(a) of the Lanham Act against all Defendants (Count 4); Brown's claim for breach of contract against B2 (Count 5); Brown and the Estate's "claim" for a permanent injunction against Showtime, BBC, and Passion Pictures Corp. (Count 6); and Brown's claim for tortious interference with contractual relations against all Defendants except B2 (Count 7).

---

[2]     The Court is referring to the first of two paragraphs that are both numbered ¶ 79.

5

Plaintiffs voluntarily dismissed its claims against Passion Pictures Corp. on March 25, 2019, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i).  (Dkt. No. 40.)

On April 2, 2019, BBC moved to dismiss the Complaint as against it for want of personal jurisdiction under Fed. R. Civ. P. 12(b)(2).  (Dkt. No. 50.)

That same day, Showtime and BBC moved to dismiss the claims against them for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  (*Id.*)

On June 11, 2019, counsel for the remaining Defendants—Baker-Simmons, Shelley, B2, and Simmons Shelley Entertainment, LLC (the "Simmons/Shelley Defendants")—submitted a letter in which they stated, "After reviewing [Showtime and BBC's] motion, it became apparent that these defenses apply similarly to the Simmons/Shell[e]y Defendants as well," and so they asked that the Court treat their letter "as a letter motion to amend the pleadings such that my clients can join in Showtime's pending motion to dismiss."  (Dkt. No. 62.)

I really do not understand the phrase in the letter about amending the pleadings.  Assuming it is a suggestion that the Simmons/Shelley Defendants be allowed to withdraw the answer they have already filed (Dkt. No. 27) so they can join in the motion to dismiss, I note that, even after filing an answer, a defendant may seek judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Because the Simmons/Shelley Defendants are correct that the defenses raised by Showtime and BBC—if meritorious—would apply to them as well, the Court deems the Simmons/Shelley Defendants' letter as motion for judgment on the pleadings as to the counts in the complaint against which Showtime moved.  That motion is addressed to all claims asserted against Showtime—Counts One, Two, Three, Four, Six and Seven—but does not include Count Five—Brown's breach of contract claim against B2.  No motion is addressed to it and it will not be dismissed.

6

## II.    Discussion

### A.    BBC's Motion to Dismiss for Lack of Personal Jurisdiction is Granted

#### 1.    Applicable Legal Standard

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendants. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003); *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). The plaintiff's burden of proof "depends upon the procedural context in which the jurisdictional challenge is raised." *Navaera Scis., LLC v. Acuity Forensic Inc.*, 667 F. Supp. 2d 369, 373 (S.D.N.Y. 2009). Where, as here, no evidentiary hearing has been held, plaintiffs "need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists." *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (citation omitted). "This showing may be made through the plaintiff's own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Id.* The pleadings, affidavits, and other supporting materials are construed in a light most favorable to plaintiffs, and all doubts are resolved in their favor. *Id.*

The Court, however, "will not draw argumentative inferences in the plaintiff's favor." *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 93 (2d Cir. 2008) (citation omitted). Nor may a plaintiff rely on conclusory statements without any supporting facts, "as such allegations would 'lack the factual specificity necessary to confer jurisdiction.'" *Mazloum v. Int'l Commerce Corp.*, 829 F. Supp. 2d 223, 227 (S.D.N.Y. 2011) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)).

Here, Brown and the Estate's pleadings supply no basis for personal jurisdiction over BBC. Nor have they submitted any affidavits or other extrinsic material pertaining to this issue. BBC,

7

in contrast, has submitted two declarations. (*See* Decl. of Clive Illenden ("Illenden Decl."), dated

Apr. 1, 2019, Dkt. No. 49; Supplemental Decl. of Clive Illenden ("Illenden Supp. Decl."), dated

May 14, 2019, Dkt. No. 61.) Brown and the Estate argue that the Court should disregard BBC's

declarations altogether because they are not notarized. (Pls.' Mem. of Law in Opp. Mot. to Dismiss

("Pls.' Opp."), at 34, Dkt. No. 57.)[3] However, the fact that a declaration is not notarized does not

preclude the Court from considering the factual statements contained therein, where, as here, the

declarations are signed "under penalty of perjury." *See* 28 U.S.C. § 1746(2); *Martinez v. Zero*

*Otto Nove Inc.*, No. 15 Civ. 899 (ER), 2016 WL 3554992, at \*3 (S.D.N.Y. June 23, 2016) (quoting

*Guzelgurgenli v. Prime Time Specials Inc.*, 883 F. Supp. 2d 340, 352 (E.D.N.Y. 2012)). The Court

will consider both declarations.

To determine whether personal jurisdiction exists over a non-domiciliary, courts engage in

a two-step inquiry. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)

(citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007)). Courts first apply the

long-arm statute of the forum state to see whether it permits the exercise of personal jurisdiction

over the defendants. If the laws of the forum state permit jurisdiction, courts then consider whether

the exercise of such jurisdiction comports with constitutional due process. *See Best Van Lines*,

490 F.3d at 244.

Because the Court resides in New York, the Court applies New York law. *See Chloe*, 616

F.3d at 163. Under New York's long-arm statute, there are two ways to establish personal

jurisdiction over a defendant: (1) "general jurisdiction" under N.Y. C.P.L.R. § 301; and (2)

"specific jurisdiction" under N.Y. C.P.L.R. § 302.

---

[3]     Plaintiffs' opposition memorandum exceeds by nine pages the twenty-five page limit for memoranda of law
in support of or in opposition to motions. (*See* the Court's Individual Practices and Procedures, Rule IV(E).) Plaintiffs
did not ask for leave to file an oversized brief. Although I will overlook Plaintiffs' non-compliance in this instance, I
note that I do not look favorably upon disregard of my rules.

Brown and the Estate assert that the Court may exercise both general and specific jurisdiction over BBC. (Pls.' Opp. at 28–33.) They are wrong on both counts.

## 2. The Court Lacks General Jurisdiction Over BBC Under C.P.L.R. § 301

General jurisdiction, or all-purpose jurisdiction, allows a court to hear "any and all" claims against a defendant. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011). Under C.P.L.R. § 301, a New York court "may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."

In *Daimler AG v. Bauman*, 571 U.S. 117, 134 (2014), the Supreme Court significantly curtailed the exercise of general jurisdiction. There, the Court considered whether Daimler, a foreign corporation, could be subjected to a California court's general jurisdiction based on the contacts of Daimler's in-state subsidiary. The Court held that, other than in an "exceptional case," a corporation is subject to all-purpose jurisdiction only in its place of incorporation and its principal place of business. *Id.* at 139 & n.19. For the "exceptional case," the relevant inquiry is not whether a foreign corporation's activities within a forum are "in some sense continuous and systematic," but rather "whether that corporation's affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* at 139 (quoting *Goodyear*, 564 U.S. at 919) (internal quotations omitted). As the Supreme Court has directed, to approve the exercise of general jurisdiction in every state in which a corporation engages in a substantial, continuous and systematic course of business would be "unacceptably grasping." *Id.* at 138. General jurisdiction calls for an appraisal of a corporation's activities in their entirety—nationwide and worldwide. *Id.* at 139 n.20.

Daimler's U.S. subsidiary had continuous contacts with California: three facilities, a regional office, and its status as the largest supplier of luxury vehicles to the California market (2.4% of Daimler's worldwide sales). *Id.* at 123. Nonetheless, the contacts of Daimler (a German

9

corporation) with California were deemed not significant enough to render it essentially "at home" in the forum. *Id.* at 136.

Emphasizing that, "[I]t is one thing to hold a corporation answerable for operations in the forum State, quite another to expose it to suit on claims having no connection whatever to the forum State," *Daimler*, 571 U.S. at 139 n.19 (citation omitted), the Court cautioned that a corporation "that operates in many places can scarcely be deemed at home in all of them." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) (quoting *Daimler*, 571 U.S. at 139 n.20.) And so, when a corporation is neither incorporated in a state nor maintains its principal place of business there, mere contacts, no matter how "systematic and continuous," are extraordinarily unlikely to add up to an "exceptional case." *Id.*

Indeed, the Court in *Daimler* cited only its decision in *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952), as an example of an "exceptional case." *Brown*, 814 F.3d at 627 (quoting *Daimler*, 571 U.S. at 139 n.19). In *Perkins*, the defendant company's principal place of business was—temporarily, because of wartime circumstances—in Ohio, where it was sued. *See Perkins*, 342 U.S. at 447–50. The Court deemed the place of service in those unusual circumstances "a surrogate for the place of incorporation or head office." *Daimler*, 571 U.S. at 130 n.8 (citation omitted). On that basis alone, it permitted the Ohio court's exercise of general jurisdiction over the company. *Id.*

In *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014), the Second Circuit applied the holding of *Daimler* to New York's long-arm statute. At issue was whether a foreign bank with four branch offices in the United States, including one in New York, was subject to general jurisdiction in a New York court. *Id.* at 135. Prior to *Daimler*, controlling precedent would have subjected the foreign bank to general jurisdiction by virtue of its "continuous and systematic

10

course of doing business" out of the New York office. *Id.* at 136 (citations omitted). After *Daimler*, however, the existence of a local office in New York was deemed insufficiently "exceptional," because the Bank's contacts to New York through that one local office were not "so continuous and systematic as to render it essentially at home in the forum." *Id.* at 135 (quoting *Daimler*, 571 U.S. at 138 & n.19).

BBC is not incorporated in New York—it was established by Royal Charter and Agreement by the Parliament of the United Kingdom. (Illenden Decl. ¶ 2.) BBC's principal place of business is in London. (*Id.*) BBC is not qualified to do business in New York, does not pay taxes in New York, and has no offices, employees, or property in New York. (*Id.* ¶ 4.) Brown and the Estate do not dispute these facts in their opposition memorandum; they acknowledge that BBC is an entity in the United Kingdom in their Complaint. (Compl. ¶ 6.)

Nevertheless, Brown and the Estate provide six examples of BBC's contacts with New York which, they argue, should mandate the Court's exercise of general jurisdiction over BBC: (1) BBC broadcasts the BBC America and BBC World News television channels in New York, pursuant to contracts with New York corporations (*i.e.*, cable companies such as Verizon, Time Warner, and Cablevision) (Pls.' Opp. at 29–31); (2) BBC has subsidiaries in New York (*id.* at 31); (3) BBC promoted its involvement with *Whitney: Can I Be Me* in New York (*id.* at 31–32); (4) BBC allegedly committed the intentional tort of tortious interference with contractual relations in New York (*id.* at 32); and (5) BBC has appeared in litigation in New York in three prior cases (*id.*).

Although some, perhaps all, of these contacts would have been sufficient to confer general jurisdiction under the more forgiving "doing business" standard that existed in the past, BBC's contacts fail to clear the high bar for a state's exercise of personal jurisdiction over a foreign

11

corporation that was set by *Daimle*. Brown and the Estate bear a heavy burden when they assert that BBC's presence in New York presents an "exceptional case." *See generally Brown*, 814 F.3d at 627.

BBC's contacts with New York are without a doubt *in some sense* continuous and systematic. BBC America and BBC World News are broadcast into New York, 24/7/365. BBC has entered into contracts with New York-based enterprises, including Verizon, Time Warner Cable, and Cablevision, to broadcast the programming that is its product. And BBC employs journalists in New York to report on stories.

However, given the record before the Court and the "considerably altered analytic landscape" for general jurisdiction post-*Daimler*, the Court cannot exercise general jurisdiction over BBC in New York simply because it gathers and broadcasts news program in the United States. *Brown*, 814 F.3d at 619.

*First*, BBC's declarations (the veracity of which Plaintiffs do not contest) establish that subsidiaries of BBC, not BBC itself, are responsible for broadcasting its television channels in New York. Specifically, BBC America is jointly owned by subsidiary BBC Studios and AMC Networks, and BBC World News is owned by subsidiary BBC Global News, Ltd. (Illenden Supp. Decl. ¶¶ 2, 3.)

Even if the Court were to accept as true Plaintiffs' conclusory allegation that BBC, rather than its subsidiaries, broadcasts its television channels in New York pursuant to contracts with local cable providers, this is not sufficient for the exercise of general jurisdiction. If it were, then any state into which BBC programming is broadcast pursuant to contracts with in-state cable providers could exercise general jurisdiction over BBC. That was precisely the concept rejected in *Daimler:* that a corporation could be subject to general jurisdiction in every state in which it

12

conducted even substantial business. *Brown*, 814 F.3d at 640. The principle applies with equal force here.

*Second*, the existence of BBC's New York subsidiary (BBC Studios) does not mean that general jurisdiction can be exercised over the parent corporation. The Supreme Court has rejected so expansive an understanding of "agency" as a basis for general jurisdiction. *See Daimler*, 571 U.S. at 136 (foreign corporations may not be subject to general jurisdiction "whenever they have an in-state subsidiary or affiliate"); *Gucci America*, 768 F.3d at 135 (the existence of a foreign corporation's local office in New York insufficient to make out an "exceptional case.").

*Third*, BBC's alleged marketing and promotion of *Whitney: Can I Be Me* in New York is insufficient to warrant the exercise general jurisdiction. After *Daimler*, the Second Circuit has found general jurisdiction lacking in at least three notable cases in which plaintiffs alleged even more significant continuous and systematic contacts than in the present case.

In *Brown*, 814 F.3d at 629, the Court found defendant Lockheed Martin's contacts with Connecticut insufficient for the exercise of general jurisdiction even though Lockheed had continuously maintained a physical presence in Connecticut for over 30 years, ran operations out of as many as four leased locations in the State, employed up to 70 workers there, and derived about $160 million in revenue from its Connecticut-based work during the relevant timeframe. *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 343–44 (2d Cir. 2018) (quoting *Brown*, 814 F.3d at 627–29). Lockheed was neither incorporated nor headquartered in Connecticut, and these contacts were not enough to constitute an "exceptional case" making Lockheed Martin "essentially at home" in Connecticut. *Id.* (quoting *Brown*, 814 F.3d at 628-631).

13

In *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221 (2d Cir. 2014), a foreign corporation's negotiations, transactions, contracts and an office in New York were insufficient to warrant the exercise of general jurisdiction. *Id.* at 226.

In *Hood v. Ascent Med. Corp.*, 691 F. App'x 8 (2d Cir. 2017), two Delaware corporations' product sales in New York and their maintenance of an office in New York were legally insufficient grounds for the Court to exercise general jurisdiction in an "exceptional case." *Id.* at 10.

These cases amply demonstrate that BBC's contacts to New York are insufficient as a matter of law so as to support the exercise of general jurisdiction over it.

*Fourth*, the commission of a tort in a state does not suffice to confer *general* jurisdiction over a party; at most, such conduct suffices for *specific* jurisdiction. *See* N.Y. C.P.L.R. § 302; *Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 105–106 (S.D.N.Y. 2015). This argument, therefore, will be addressed in the proceeding section. *Infra* at 14.

*Fifth*, BBC's appearance in prior litigation in three New York cases fails to establish general jurisdiction. None of these cases mentioned by Plaintiffs discussed issues relating to personal jurisdiction—*Byrne v. British Broadcasting Corp.*, 132 F. Supp. 2d 229 (S.D.N.Y. 2001) and *Gross v. British Broadcasting Corp.*, 386 F.3d 224 (2d Cir. 2004) addressed the concept of *forum non conveniens*—and all of them predate *Daimler*, which was decided in 2014. That a federal court residing in New York exercised jurisdiction over BBC prior to *Daimler* does not mean that the same court could exercise general jurisdiction over it today.

In sum, with the Second Circuit cautioning against adopting "an overly expansive view of general jurisdiction" following *Daimler*, the mere facts that BBC airs television programming in New York and has a subsidiary in New York are insufficient to confer general jurisdiction in a

14

state that is neither BBC's state of incorporation nor its principal place of business. *Gucci America*,

768 F.3d at 135.

### 3. The Court Lacks Specific Jurisdiction Over BBC Under C.P.L.R. § 302

The Court can exercise specific jurisdiction over BBC only if doing so complies both

with New York's long-arm statute and constitutional due process. *Id.* at 136.

New York's long-arm statute provides:

(a) **Acts which are the basis of jurisdiction**. As to a cause of action arising from any of
the acts enumerated in this section, a court may exercise personal jurisdiction over any
non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or
services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation
of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within
the state, except as to a cause of action for defamation of character arising from the
act, if he

(i)     regularly does or solicits business, or engages in any other persistent course of
conduct, or derives substantial revenue from goods used or consumed or services
rendered, in the state, or

(ii)    expects or should reasonably expect the act to have consequences in the state and
derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302.

Although Brown and the Estate do not mention any provisions of N.Y. C.P.L.R. § 302 as

a basis for conferring specific jurisdiction over BBC, the Court will address each subsection.

### a)     *C.P.L.R. § 302(a)(1)*

Relying on the same arguments that they asserted with respect to general jurisdiction,

Brown and the Estate argue that the Court should exercise specific jurisdiction over BBC because

BBC contracts with cable providers to air its own television programming in New York. (Pls.' Opp. at 33.)

Even accepting Plaintiffs' allegations as true, those allegations do not suffice to confer specific jurisdiction over BBC under C.P.L.R. § 302(a)(1) in this case. Brown and the Estate have not identified any nexus between BBC's "television deals" with cable providers and the claims they assert here in connection with the airing of *Whitney: Can I Be Me*. On the contrary, the evidence before the Court indicates that any such "television deal" involving BBC related to its broadcasting this particular film in *other countries*. Specifically, BBC acquired the rights to broadcast the film in the U.K. It did not distribute the film in the U.S. (Illenden Decl. ¶ 5.)

Moreover, BBC Studios, BBC's commercial subsidiary, was not involved in the production or distribution of the film. (*Id.* ¶ 7.) BBC's now defunct subsidiary BBC Worldwide was also not involved in the production or distribution of the film. (*Id.* ¶ 8.) And BBC Global News LTD, the BBC commercial subsidiary that operates the BBC World News television channel, was not involved in the production or distribution of the film. (Illenden Supp. Decl. ¶ 3.)

As the Second Circuit found in *Licci v. Lebanese Canadian Bank*, 673 F.3d 50 (2d Cir. 2012), the lack of any nexus between *Whitney: Can I Be Me* and BBC's contracts with local television providers means that BBC has not purposefully availed itself of New York law within the meaning of C.P.L.R. § 302(a)(1). *Id.* at 60–61; *accord D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).

Brown and the Estate's reliance on two Minnesota cases—which, of course, are not binding on this Court—does not alter the Court's conclusion in this regard. Besides for the fact that those cases involved a different state's long-arm statute, neither case stands for the proposition that a court can exercise specific jurisdiction over a party when the cause of action asserted is unrelated

16

to that party's contacts with the forum state, which is the case here. *See Imation Corp. v. Sanho Corp.*, No. CV 15-1883 (JRT/JSM), 2016 WL 4179363, at *3 (D. Minn. Aug. 5, 2016); *WhatRU Holding, LLC v. Bouncing Angels, Inc.*, No. CIV. 13-2745 JNE/TNL, 2014 WL 641517, at *3 (D. Minn. Feb. 19, 2014).

### b)    C.P.L.R. §§ 302(a)(2) and 302(a)(3)

Brown and the Estate next argue that the Court may exercise specific jurisdiction over BBC because BBC tortuously interfered with Brown's contract with B2 by airing a film that used unauthorized footage from *Being Bobby Brown* in *Whitney: Can I Be Me.* (Pls.' Opp. at 32–33; *see also* Compl. ¶¶ 33–34.)

In making this argument, Plaintiffs do not specify whether they are invoking N.Y. C.P.L.R. §§ 302(a)(2) or (3) as a basis for specific jurisdiction. Both will be addressed.

Section 302(a)(2) only extends specific jurisdiction to claims arising from the commission of a tortious act *within New York state*. Fatally, Brown and the Estate do not plead any facts that suggest that BBC committed this tort in New York. Indeed, the pleadings indicate that BBC's alleged tortious conduct occurred elsewhere. For example, the Complaint acknowledges that BBC aired the film in the U.K., not the U.S. (Compl. ¶ 18; *id.* Ex. G.) It also alleges that BBC "and/or" Showtime licensed the film to foreign production companies to air in Germany, Italy, and the Netherlands—but it does not allege that BBC did this in New York. (Compl. ¶ 20.) Accordingly, even after accepting the facts presented by Plaintiffs as true, Plaintiffs have not met their burden to establish that BBC tortuously interfered with Brown's contractual relations *in New York*. Thus, C.P.L.R. § 302(a)(2) does not grant specific jurisdiction over BBC.

C.P.L.R. § 302(a)(3) is also inapposite. This section confers specific jurisdiction over a party who commits a tortious act outside the state *and* causes injury to person or property within the state, but only if the party:

> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;

N.Y. C.P.L.R. § 302(a)(3)(i)-(ii). Brown and the Estate do not allege that they were injured *within New York state* as a result of BBC's alleged tortious act outside the state. Moreover, the Second Circuit has interpreted the injury requirement in § 302(a)(3) to mean that the "original event which caused the injury" must have taken place in New York. *Doe v. Delaware State Police*, 939 F. Supp. 2d 313, 327 (S.D.N.Y. 2013) (quoting *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30, 39 (2d Cir. 2010)). Here, the original event was BBC's airing of the film *in the U.K.* Brown is a California resident, and the Estate is located in Georgia. (Compl. ¶¶ 3, 4.) Brown and the Estate do not plead any facts tending to show that they were harmed in New York.

Since Plaintiffs fail to demonstrate that BBC's tortious act caused injury to them in New York, neither C.P.L.R. § 302(a)(3)(i) nor (ii) grants specific jurisdiction over BBC.

### c) *C.P.L.R. § 302(a)(4)*

C.P.L.R. § 302(a)(4) provides that a court may exercise jurisdiction over a defendant if he owns, uses, or possesses any property within New York that serves as the basis for plaintiffs' cause of action. Because Brown and the Estate have not alleged that BBC's owning of property in New York gave rise to their lawsuit, this provision does not apply.

Since New York's long-arm statute does not confer jurisdiction, specific or general, over Plaintiffs' claims, BBC's motion to dismiss for lack of personal jurisdiction is granted.

## B. Defendants' Motion to Dismiss is Granted In Part and Denied In Part

### 1. Applicable Legal Standard

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), the Court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (internal quotation marks omitted). The claims will survive the motion to dismiss as long as they contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The plaintiff must do more, however, than merely attach "labels and conclusions" to bald factual assertions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

In addition to the text of the Complaint, the Court may consider documents that are appended as exhibits, incorporated by reference, or are otherwise "integral" to the allegations contained therein. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). The Court may consider the documentary film, *Whitney: Can I Be Me*, attached by exhibit to Defendants' Declaration, since the film is integral to the Complaint. (Decl. of Samuel M. Bayard, in Supp. Defs.' Mot. to Dismiss ("Bayard Decl.") (Dkt No. 48) Ex. A.) The Court will consider the film itself—not the parties' characterizations of what it shows.

### 2. Brown's Right of Publicity Claims (Counts 1 and 2)

Brown's first two causes of action allege violations of his right of publicity under California Civil Code § 3344 (Count 1) and California common law (Count 2). Brown alleges that

19

Defendants used his name, likeness and persona without his consent—both in the film itself as well as marketing and promoting it. (Compl. ¶¶ 29–30, 37–46.)

Because the statutory cause of action requires a plaintiff to prove all the elements of the common law cause of action (in addition to two elements), *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001), the Court will discuss the common law cause of action first.

### a) *Brown's Right of Publicity under California Common Law*

California's common law right of publicity "prohibit[s] any other person from using a celebrity's name, voice, signature, photograph, or likeness for commercial purposes without the [celebrity's] consent." *Sarver v. Chartier*, 813 F.3d 891, 903 (9th Cir. 2016) (quoting *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 799 (Cal. 2001)).

The elements of a common law claim of misappropriation of the right of publicity are: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Downing*, 265 F.3d at 1001 (quoting *Eastwood v. Superior Court*, 198 Cal. Rptr. 342, 347 (Ct. App. 1983), *superseded by statute on other grounds as recognized in KNB Enters. v. Matthews*, 792 Cal. Rptr. 2d. 713, 717 n.5 (Ct. App. 2000)).

Defendants do not dispute that Brown properly pleads these elements. Rather, they argue that *Whitney: Can I Be Me* is an expressive work and a report on a matter of public interest, such that it is immune from suit under both the First Amendment and California law. (Defs.' Mem. of Law in Support Mot. to Dismiss ("Defs.' Mem."), at 6–8, Dkt. No. 47.) They are correct.

The First Amendment distinguishes between commercial and non-commercial speech, the latter being subjected to much greater degrees of protection. "'Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment

values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression.'" *See Charles v. City of L.A.*, 697 F.3d 1146, 1151 (9th Cir. 2012) (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995)). "[T]he 'core notion of commercial speech' is that it 'does no more than propose a commercial transaction.'" *Hoffman v. Capital Cities/ABC Inc.*, 255 F.3d 1180, 1884 (9th Cir. 2001) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)).

Under the First Amendment, a right of publicity cause of action may not be maintained against "expressive works, whether factual or fictional." *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1123 (N.D. Cal. 2002) (quoting *Guglielmi v. Spelling-Goldberg Productions*, 603 P.2d 454, 462 (Cal. 1979) (Bird, J. concurring)). Without this protection, "reports and commentaries on the thoughts and conduct of public and prominent persons" would be subject to censorship "under the guise of preventing the dissipation of the publicity value of a person's identity." *Guglielmi,* 603 P.2d at 462.

It has long been established that motion pictures are a form of expression protected by the First Amendment. *See Natco Theatres, Inc. v. Ratner*, 463 F. Supp. 1124, 1128 (S.D.N.Y. 1979) (citing cases).

The First Amendment also prohibits right of publicity causes of action related to the publication of matters in the public interest. *Montana v. San Jose Mercury News, Inc.*, 40 Cal. Rptr. 2d 639, 640 (Ct. App. 1995) (quoting *Dora v. Frontline Video Inc.,* 18 Cal. Rptr. 2d 790, 792 (Ct. App. 1993)). This prohibition relates to "almost all reporting of recent events," as well as to publications about "people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities." *Eastwood*, 198 Cal. Rptr. at 342.

21

Applying these standards to the present case, Brown's right of publicity claim is barred under the First Amendment, because *Whitney: Can I Be Me* qualifies both as an expressive work and as a report on a matter of public interest.

*Whitney: Can I Be Me*, by virtue of being an expressive work, is protected under the First Amendment. The First Amendment "safeguards the storytellers and artists who take the raw materials of life—including the stories of real individuals, ordinary or extraordinary—and transform them into art, be it articles, books, movies, or plays." *Sarver v. Chartier*, 813 F.3d 891, 905 (9th Cir. 2016). Here, Defendants and the film's directors, producers, and associated creative staff drew upon the raw materials of Whitney Houston's life story and created a film depicting that story. Courts applying California law have consistently held that films and television programs based on true events are constitutionally protected expressive works. *See Sarver*, 813 F.3d at 905; *Guglielmi*, 603 P.2d at 462; *De Havilland v. FX Networks, LLC*, 230 Cal. Rptr. 3d 625, 630 (Ct. App. 2018).

*Whitney: Can I Be Me* is also protected as a matter of public interest. Its subject matter includes the life story of a world-famous musician who had a lasting impact on popular culture. Brown, too, is a well-known entertainer. Houston and Brown are "people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities." *Eastwood*, 198 Cal. Rptr at 342. Brown, a self-described "legend" and "international superstar" who has sold millions of albums, has undoubtedly contributed to Houston's life story. (Compl. ¶¶ 12, 55.) In addition to being known for his music career, Brown is well-known for his personal relationship with Houston; Brown concedes that information about him and Houston is "very valuable and of interest to the public." (*Id.* ¶ 20.)

22

The appropriation of a celebrity's likeness may be important to uninhibited debate on public issues, particularly debates about culture and values. *Comedy III Prods., Inc.*, 21 P.3d at 803. A film review, attached as an exhibit to Plaintiffs' Complaint, notes the cultural impact of Houston as "one of the most successful pop icons the world has seen" and comments on the film's important role in "preserving a necessary account of the truth behind the tabloids." (*See* Compl., Ex. D.) Another review states that the film "delivers...[a] tragic lesson in the toxic mix of fame, talent and children; it should be required viewing for all those who seek to follow this diva's path to fame and fortune." (*See* Compl., Ex. E.) These reviews speak to the public interest in the film and its subject matter.

Brown repeatedly asserts that he never signed a "video release form" that authorized the use of his likeness in *Whitney: Can I Be Me.* (Compl. ¶¶ 15–16.) However, no such agreement is necessary where, as here, the film and its portrayal of Brown are protected under the First Amendment. In *De Havilland*, 230 Cal. Rptr. 3d at 630, the court held that FX Networks' "docudrama" (a fictionalized television miniseries based on the lives of real Hollywood actresses, including Olivia de Havilland) was protected by the First Amendment as an expressive work. *Id.* at 630. The fact that the docudrama's creators did not purchase or otherwise procure de Havilland's "rights" to her name and likeness did not change the result. *Id.* at 639.

It is true that producers of films and television programs often enter into agreements with individuals portrayed in those works for a variety of reasons, including obtaining access to the person's recollections or "story" the producers would not otherwise have, or a desire to avoid litigation for payment of a reasonable fee. *Id.* But no acquisition agreement is required where First Amendment concerns are implicated. *See, e.g.*, *Polydoros v. Twentieth Century Fox Film Corp.*, 79 Cal. Rptr. 2d 207, 212 (App. Ct. 1997) ("[t]he industry custom of obtaining 'clearance'

23

establishes nothing, other than the unfortunate reality that many filmmakers may deem it wise to pay a small sum up front for a written consent to avoid later having to spend a small fortune to defend unmeritorious lawsuits such as this one.").

The cases on which Plaintiffs rely in their opposition memorandum are inapposite. Each of them involves the misappropriation of a celebrity's persona, likeness and/or voice for use in *commercial advertisements*. (*See* Pls.' Opp. at 9–15.) The right of publicity, at its core, aims to prevent merchandising of a celebrity's image without that person's consent. *Hilton v. Hallmark Cards*, 599 F.3d 894, 910 (9th Cir. 2009). The Ninth Circuit has long held that speech which appropriates the economic value of a performance or persona or seeks to capitalize off a celebrity's image in commercial advertisements is not protected by the First Amendment against a California right of publicity claim. *Sarver v. Chartier*, 813 F.3d 891, 905 (9th Cir. 2016). Celebrities have successfully pursued right of publicity claims for the usage of their images, likenesses, and catchphrases, but only in the limited context of commercial advertisements and product sales. *See Hilton*, 599 F.3d at 899; *Davis v. Elec. Arts, Inc.,* 775 F.3d 1172 (9th Cir. 2015); *White v. Samsung Elecs. Am., Inc.,* 971 F.2d 1395, 1397–99 (9th Cir. 1992).

Here, Brown's name, likeness, and persona were not appropriated to sell products, were not used in commercial advertisements, and did not appropriate the economic value of Brown's performance or persona. While Brown argues that Defendants used his name, persona, image and likeness when marketing and promoting the film, any depiction of Brown in the advertising for a constitutionally protected film is itself protected and not actionable under California's common law right of publicity. *See de Havilland*, 230 Cal. Rptr. 3d at 639 (the "use of a person's name and likeness to advertise a novel, play, or motion picture concerning that individual is not actionable as an infringement of the right of publicity."). Advertisements of expressive works are not

actionable where the advertisements are "merely an adjunct of the protected [work] and promote only the protected [work]." *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1123 (N.D. Cal. 2002) (quoting *Cher v. Forum Int'l Inc.*, 692 F.2d 634, 639 (9th Cir. 1982). The fact that expressive works, including films, plays, books, and television shows, generate income for their creators does not diminish their constitutional protection. *De Havilland*, 230 Cal. Rptr. 3d at 630.

For these reasons, Brown's right of publicity claim under California common law (Count 2) is dismissed.

### b)       *Brown's Right of Publicity under Cal. Civ. Code § 3344*

California's statutory remedy for commercial misappropriation embodies all the elements of California's common law cause of action, and recognizes an affirmative defense grounded in the First Amendment right to report on matters of public interest. Cal. Civ. Code § 3344(a) and (d); *Eastwood*, 198 Cal. Rptr. at 347. Having concluded that Brown's common law cause of action must yield to this protection, the Court similarly concludes that Brown's statutory cause of action is barred by the First Amendment as well.

Brown's right of publicity claim under Cal. Civ. Code § 3344 (Count 1) is also dismissed.

### 3.   Estate's Right of Publicity Claim (Count 3)

Count three is directed exclusively at Showtime. The Estate of Bobbi Kristina Brown alleges that Showtime violated its right of publicity under Georgia common law by using Bobbi Kristina's name, likeness, and persona in the film without the Estate's consent and for its own personal gain. (Compl. ¶¶ 28, 47–52.)

In Georgia, a right of publicity claim consists of the appropriation of another's name and likeness, without consent, for the financial gain of the appropriator. *Bullard v. MRA Holding, LLC*, 740 S.E.2d 622, 626 (Ga. 2013) (citing *Martin Luther King, Jr., Ctr. for Soc. Change, Inc.*

25

*v. Am. Heritage Prod., Inc.*, 296 S.E.2d 697, 703 (Ga. 1982)). The right of publicity survives the death of its owner and is inheritable and devisable. *Martin Luther King, Jr.*, 296 S.E.2d at 705.

Showtime does not dispute that the Estate has sufficiently pleaded a right of publicity claim under Georgia law. Rather, Showtime asserts an affirmative defense under Georgia law grounded in the First Amendment, similar to that under California law.

In order to navigate between the competing constitutionally protected rights of publicity and the rights of freedom of speech and of the press, Georgia courts have adopted a "newsworthiness" exception to the right of publicity. *Toffoloni v. LFP Publ'g Grp., LLC*, 572 F.3d 1201, 1208 (11th Cir. 2009) (citing Georgia cases). The Supreme Court of Georgia has held that "where an incident is a matter of public interest, or the subject matter of a public investigation, a publication in connection therewith can be a violation of no one's legal right of privacy." *Id.* (quoting *Waters v. Fleetwood*, 91 S.E.2d 344, 348 (Ga. 1956)).

The Estate's right of publicity claim must be dismissed because the use of Bobbi Kristina Brown's likeness in *Whitney: Can I Be Me* is considered "newsworthy" under Georgia law. There is a clear distinction between *commercial use* and *newsworthy use* of a person's name and likeness. *Toffoloni*, 572 F.3d at 1208 (emphasis added). Unauthorized commercial use of a person's name and likeness in advertising and merchandising is not protected. *See Martin Luther King, Jr.*, 296 S.E.2d at 706 (holding that the manufacture and sale of plastic busts of Dr. Martin Luther King, Jr. violated King's right of publicity). The use of a newsworthy person's name and likeness is protected, and this includes the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses. *Found. for Lost Boys v. Alcon Entm't, LLC*, No. 15-Civ-00509-LMM, 2016 WL 4394486, at *21 (N.D. Ga. Mar. 22, 2016).

26

Here, Showtime did not use Bobbi Kristina's name, likeness, voice or persona related to the manufacture, sale or advertising of any commercial products. *Whitney: Can I Be Me* is a non-fiction, documentary film. The life of pop icon Whitney Houston is certainly a matter of "public interest," and her familial relationships are integral in depicting her life story. That the publisher gains some "commercial advantage from an otherwise permitted use of another's identity does not render the appropriation actionable." *Somerson v. World Wrestling Entm't, Inc.*, 956 F. Supp. 2d 1360, 1370 (N.D. Ga. 2013). Even if Showtime profited from the release of the film, that is not enough for the Estate to state an appropriation claim; the use itself must be improper, and here, the use was proper under the newsworthiness exception. *Found. for Lost Boys v. Alcon Entm't, LLC*, 2016 WL 4394486, at *21 n.20.

Finally, the marketing of the film does not give rise to a right of publicity claim under Georgia law. Since the use of Bobbi Kristina's likeness in the film itself is protected, the use of her likeness in any advertising of the film is also protected. *See Thoroughbred Legends, LLC*, 2008 WL 616253, at *12.

The Estate's right of publicity claim under Georgia law (Count 3) is dismissed.

### 4. Brown's Lanham Act Claim (Count 4)

Next, Brown alleges that all Defendants violated Section 43(a)(1)(A) of the Lanham Act (Count 4). (Compl. ¶ 54.) He argues that the use of his name and likeness in the film, the credits of the film, and the marketing and promotion of the film has caused consumer confusion as to the origin of the film, falsely suggesting Brown's endorsement. (Compl. ¶¶ 53–58.)

Section 43(a)(1)(A) of the Lanham Act provides, in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

27

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a)(1).

Section 43(a) protects the public's interests in being free from consumer confusion about affiliations and endorsements. But this protection is limited by the First Amendment, particularly if the product involved is an expressive work. *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1239 (9th Cir. 2013). Recognizing the need to balance the First Amendment interest in free expression against the public's interest in being free from consumer confusion about affiliation and endorsement, the Second Circuit created the "*Rogers* test" in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).

*Rogers* involved a suit brought by the famous performer Ginger Rogers against the producers and distributors of *Ginger and Fred*, a movie about two fictional Italian cabaret performers who imitated Rogers and her frequent dancing partner Fred Astaire. *Rogers*, 875 F.2d at 996–97. Among Rogers' claims was that the use of her name in the title of the movie violated § 43(a) by creating the false impression that she was involved with the film. *Id.* at 997. Recognizing that enforcing § 43(a) in this context might constrain free expression in violation of the First Amendment, the Second Circuit asserted that the Lanham Act should be "appl[ied] to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.* at 999. The *Rogers* court introduced a two-pronged test, holding that the Lanham Act is inapplicable to "artistic works" as long as the defendant's use of the mark or other identifying material is (1) "artistically relevant" to the work and (2) not "explicitly misleading" as to the source of content of the work." *Id.*

28

While *Rogers* was focused on the title of an artistic work, the Second Circuit has expanded its two-prong test to apply to artistic works more broadly. *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group*, 886 F.2d 490, 495 (2d Cir. 1989) (the *Rogers* test is "generally applicable to Lanham Act claims against works of artistic expression").

Brown's opposition memorandum cites to cases considering application of the "transformative use" defense, a defense that asks whether a defendant's use of the plaintiff's name and likeness contained sufficiently significant transformative elements. (Pls.' Opp. at 16–19.) Defendants, however, do not raise the transformative use defense, so the Court need not assess it.

The Court, applying the *Rogers* test, finds that the use of Brown's likeness is artistically relevant to the film, and that Brown fails to plead facts showing that Defendants were explicitly misleading as to the source or content of the film. Count 4 must be dismissed.

### *a)      Artistic Relevance*

The threshold for "artistic relevance" is purposely low and will be satisfied unless the use "has no artistic relevance to the underlying work whatsoever." *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (quoting *Rogers,* 875 F.2d at 999); *see also Rock Star Videos, Inc.*, 547 F.3d at 1100 (holding that, under *Rogers,* "the level of relevance merely must be above zero"). The artistic relevance prong ensures that the defendant intended an artistic—*i.e.*, noncommercial—association with the plaintiff's mark, as opposed to one in which the defendant intends to associate with the mark to exploit the mark's popularity and good will. *Louis Vuitton*, 868 F. Supp at 178. In *Rogers*, 875 F.2d at 1001, the Second Circuit found that the defendant satisfied the artistic relevance prong where its use of the trademark was "not arbitrarily chosen just to exploit the publicity value of [the plaintiffs' mark] but instead ha[d] genuine relevance to the film's story."

29

Here, the film is a biographical documentary charting Whitney Houston's life story, and Brown's appearance in the film is artistically relevant in depicting that story. Brown undoubtedly played a major role in Houston's life, as her ex-husband and father to her child. (*See* Ex. E; film review of *Whitney: Can I Be Me* discusses Houston and Brown's widely known "complicated" relationship). The level of Brown's relevance is "above zero" in this case.

Brown's reliance on *Gordon v. Drape Creative, Inc.*, 909 F.3d 257 (9th Cir. 2018)—a case that is not binding on me—is inapposite. (*See* Pls.' Opp. at 23–24.) In *Gordon,* the defendant recreated plaintiff's trademarked catchphrases on the front covers of greeting cards, without any other text. *Id.* at 262, 269. In this instance, using plaintiff's mark alone on the cards was sufficient to find the defendant was "explicitly misleading" consumers to believe that plaintiff was the source of the greeting cards. *Id.* at 271. Although *Gordon* focuses its analysis on the second prong of the *Rogers* test, Brown relies exclusively on *Gordon* to explain that the use of his marks in the film are not artistically relevant under the *first* prong. This does not change the Court's finding that the use of Brown's name and likeness is artistically relevant to the film.

### *b)     Explicitly Misleading*

Defendants' use of Brown's name and likeness is unprotected only if it "explicitly misleads as to the source or content of the work." *Rogers*, 875 F.2d at 999. The relevant question is whether the defendant's use of the mark "is misleading in the sense that it induces members of the public to believe [the work] was prepared or otherwise authorized" by the plaintiff. *Louis Vuitton*, 868 F. Supp. 2d at 179 (quoting *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993)). Although this determination is based on the same considerations as the likelihood of confusion factors for trademark infringement, only a "particularly compelling" finding of likelihood of confusion can overcome the First Amendment interests. *Twin Peaks*, 996

F.2d at 1379. In the context of a motion to dismiss, courts have disposed of trademark claims where simply looking at the work itself, and the context in which it appears, demonstrates how implausible it is that a viewer will be confused into believing that the plaintiff endorsed the defendant's work. *Louis Vuitton*, 868 F. Supp. 2d at 183.

Brown alleges that "the credits in the film suggest that RB's [Brown] and his company (Brownhouse) consented and authorized the use of his image and voice in the film." (Compl. ¶ 56; Ex B.) The Court concludes that Brown's allegations of confusion are not plausible, let alone "particularly compelling."

The end credits list "B2 Brownhouse Entertainment in Association with Simmons Shelley Entertainment LLC" as one of many archival sources for the film. (*Id.*) In fact, Brownhouse is one of dozens of archival sources that appear in the end credits from 1:43:48-1:44:21. (Bayard Decl., Ex. A.) The credit listing Brownhouse is visible on screen for about eight seconds, from 1:43:51-1:43:59. (*Id.*) It is not plausible that a significant number of people watching the film would pay much attention to the end credits of the film, let alone the long list of archival sources presented near the very end of the end credits. *See Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 634-35 (S.D.N.Y. 2008) (finding no confusion of plaintiff sponsoring defendant's film where "it would be difficult for even a keen observer to pick out [plaintiff's] trademark" since "it appears in the background of the scene" and "occupies only a minute fraction [of] the frame for three segments lasting approximately three seconds each"). It is even more implausible that viewers of the film interpreted "B2 *Brownhouse* Entertainment in Association with Simmons Shelley Entertainment" as understanding that *Bobby Brown* endorsed, produced, sanctioned, or approved of the film.

31

Brown alleges that Defendants' intentional "marketing strategy" capitalized on Brown's fame and caused confusion as to the origin, sponsorship, and approval of the film by using his name, image and likeness in the marketing and promotion of the film. (Compl. ¶¶ 30, 55–57.) Defendants'' alleged "strategy" entailed providing advance copies of the films to members of the press, giving the press the opportunity to view the film and write reviews before the release date, in the hopes that the reviews would mention Brown and thus would draw more attention to the film. (*Id.* ¶ 30.)

In short, none of the allegations in the Complaint here suffices to plead that Defendants' inclusion of Brown "explicitly misleads as to the source or the content of the work." A film review attached as an exhibit to the Complaint names Nick Broomfield as the creator of the "unauthorised [*sic*] documentary." (*See* Compl., Ex. E.) Put otherwise, Defendants specifically identify the persons responsible for the film, and Bobby Brown is not among them. Nor, in the other reviews attached as exhibits, do the authors state the mistaken belief that Brown endorsed the film. (*See* Compl., Exs. D and F.)

To survive a motion to dismiss for a Lanham Act claim, Brown must plead more than "conclusory allegations" and allege that Defendants explicitly misled consumers as to the source or content of the film. *See Cummings v. Soul Train Holdings LLC*, 67 F. Supp. 3d 599, 606 (S.D.N.Y. 2014). "The slight risk that…use of a celebrity's name might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression." *Rogers*, 875 F.2d at 1000.

Count 4—the only federal count in the complaint—is dismissed.

## 5. Brown's "Claim" for Permanent Injunction (Count 6)

Brown and the Estate assert a "cause of action" for a permanent injunction (Count 6). (Compl. ¶¶ 67–71). However, this is not an independent claim upon which relief could be granted,

since injunctions are remedies, not claims. *See Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 408 (S.D.N.Y. 2010).

### 6. Brown's Tortious Interference with Contract Claim (Count 7)

Brown entered into the Agreement with B2 to create *Being Bobby Brown* in March 2004. (Compl. ¶¶ 60–63; Ex. G.) Brown alleges that all Defendants other than B2 – that is, Showtime and the Simmons/Shelley Defendants -- tortiously interfered with this Agreement by obtaining unauthorized *Being Bobby Brown* footage from B2 and using it in *Whitney: Can I Be Me*. (Compl. ¶ 33.) From their failed attempt at securing an interview with Brown in June 2016, Defendants were well aware that Brown was not interested in taking part in the film. (*Id.* ¶ 29.) Brown alleges that, after he declined the interview, Defendants negotiated a "side agreement" with B2, in breach of Brown's contract with B2, to use footage from *Being Bobby Brown* in the film. (*Id.* ¶¶ 33–34.)

The Complaint does not specify under which state's laws Brown purports to bring his tortious interference with contract claim. Defendants assume for purposes of its motion to dismiss that the claim is brought under New York law, which is where Showtime resides and where it would have done any interfering. Brown argues that California law governs; the contracting parties are residents of California and Georgia and the contract does not explicitly state that it is governed by New York law. (*See* Defs.' Mem. at 15–17; Pls.' Opp. at 27–28.)

However, the five elements of a tortious interference with contract claim under New York and California law are, for all practical purposes, identical. *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 424 (1996)); *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1133 (9th Cir. 2015) (citation California law). That being so, there is no conflict of laws to work through, and this court will apply the law of the forum in which it sits (and the forum in which Brown chose to sue)—New York law. *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422 (2d Cir. 2006).

33

The five elements of tortious interference with contract are "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch*, 449 F.3d at 401–02.

Here, Brown has pleaded that (1) the Agreement constitutes a valid contract between Brown and B2; (2) Defendants had knowledge of the contractual obligations under the Agreement; (3) Defendants procured B2's breach of contract by using B2's licensed footage from *Being Bobby Brown* in the film, without Brown's consent; (4) B2 breached the Agreement by licensing said footage to Defendants for use in *Whitney: Can I Be Me*; and (5) Brown was injured as a result of Defendants' airing the film. (Compl. ¶¶ 32–36.) Defendants contest the third element. (*See* Defs.' Mem. at 16–17.)

As to the third element, "It is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third party's contract with the plaintiff; instead, a plaintiff must allege facts showing that 'the defendant's *objective* was to procure such a breach." *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 327–328 (S.D.N.Y. 2017) (citations omitted; emphasis in original).

Brown seems to have pleaded facts tending to show that Defendants intended to cause B2's breach of the Agreement.

First, Brown *generally* alleges that he informed Defendants that his rights under the Agreement with B2 were violated, and despite this notification, Defendants broadcasted *Whitney: Can I Be Me* with the knowledge that the use of Brown's image and likeness was unauthorized.

34

(Compl. ¶¶ 35–36.) Then, he *specifically* alleges that he notified Defendants of the *existence* of the Agreement in 2017—after the film already began airing in the U.S. (*Id.* ¶ 79.)[4]

Defendants argue that, based on Brown's specific allegation, the alleged breach of contract—B2's licensing the footage to Defendants without Brown's consent—necessarily occurred *before* Brown notified Defendants of the Agreement. It does seem to read that way. Defendants argue that they could not plausibly have intended to procure a breach of a contract they did not know existed. (Defs.' Mem. at 16.)

The pleading is certainly ambiguous, and therefore problematic. But at this stage, when I must draw every inference in favor of Brown, I think it prudent not to grant the motion—especially as it would have to be without prejudice to amendment. Whether and when Defendants knew about the existence of the Agreement is a question of fact that can be fleshed out in discovery. If discovery reveals that Defendants did not know of the existence of Brown's contract with B2 before Brown contacted them, Defendants can raise the issue again in a motion for summary judgment.

The Court accordingly denies Defendants' motion to dismiss Count 7.

## III. The Court Declines to Exercise Supplemental Jurisdiction over the Remaining Counts

The Court now finds itself in an untenable position.

There was not complete diversity in this action at the time it was filed; the Estate of Bobbi Kristina Brown and several of the Defendants are all citizens of the State of Georgia. (Compl. ¶¶ 3–11.) *See, e.g., Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005) (articulating complete diversity requirement) (citing cases). Therefore, the only basis for federal jurisdiction

---

4     The Court is again referring to the first of two paragraphs numbered ¶ 79.

in this matter at the time of filing—which is when the existence of federal jurisdiction is assessed, *see Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570 (2004) (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824))—is the presence of Count 4, a Lanham Act claim that was asserted against all Defendants.

Count 4 has now been dismissed (along with Counts 1, 2, 3, and 6), and the Court does not possess original subject-matter jurisdiction over the remaining state law claims (Counts 5 and 7). While this fact does not *preclude* the Court from hearing the remaining claims in this action—it could exercise supplemental jurisdiction, since those claims are "so related" to Plaintiffs' Lanham Act claim, 28 U.S.C. § 1367(a)—it does leave the Court with the *discretion* to decline to supplemental exercise subject-matter jurisdiction. *Id.* § 1367(c)(3).

That is exactly what I am going to do.

Where, as here, federal claims are eliminated in the early stages of litigation, the Second Circuit has instructed that district courts generally should decline to exercise supplemental jurisdiction over remaining state law claims. *Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006) (citing cases). Such a determination should be guided by values of judicial economy, convenience, fairness, and comity, *i.e.*, the "*Cohill* factors," as first articulated by the Supreme Court in *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988). *Klein*, 464 F.3d at 262.

Applying the *Cohill* factors to the case at bar strongly favors dismissal.

I have invested very few judicial resources to this case. It would be quite inconvenient to litigate this case in downtown Manhattan, as only one party (Showtime) is a New York resident, while the rest are either from Georgia (six parties) or California (Mr. Brown). Plaintiffs' remaining state law claims arise under the law of states other than the State of New York

(except, possibly, the tortious interference claim, but only as to Showtime). State court judges in other states are best suited to deal with them.

I therefore decline to exercise supplemental jurisdiction over what remains of this case, which is Counts 5 and 7. The complaint is dismissed in its entirety—Counts 1, 2, 3, 4 and 6 with prejudice as against all Defendants; Counts 5 and 7 without prejudice to Plaintiffs' bringing those claims in an appropriate state court.

## CONCLUSION

The case is dismissed. The Clerk of Court is directed to remove Dkt. Nos. 46 and 50 from the Court's list of open motions and close this case.

This constitutes the decision and order of the Court.

Dated: August 2, 2019

_____
Chief Judge

BY ECF TO ALL PARTIES